# CHARLESTON

## STATE v. KIDWELL.

## Submitted October 22, 1907.   Decided November 8, 1907.

1. HOMICIDE — *Defenses—Drunkenness.*

    A person who, being sane and responsible for his acts, volun-
    tarily becomes intoxicated, with or without a pre-conceived de-
    sign to commit murder or other crime, and while intoxicated,
    though it be to such a degree as to render him wholly oblivious to
    his acts or conduct, commits a homicide or does any other act
    which, if done by a person capable of distinguishing between right
    and wrong, is criminal, if not excused or justified in some way, is
    held responsible by the law for his act, notwithstanding his men-
    tal condition at the time.   (p. 468.)

2. SAME—*Insanity Induced by Intoxication.*

    Insanity, though superinduced by long continued indulgence in
    intemperance or intoxication and known as delirium tremens or
    *mania a potu*, renders the person so afflicted irresponsible for his
    acts, if it be of such character as to deprive him of the power to
    distinguish between right and wrong, whether he be under the
    influence of liquor at the time of the commission of the act or
    not; but, to do so, his affliction must be settled or fixed insanity,
    not a mere fit of drunkenness.   A person, not previously labor-
    ing under such disease or affliction, who voluntarily becomes in-
    toxicated to such an extent and for such a period of time as to
    cause unconsciousness of his acts and affliction with delusions and
    hallucinations, is not irresponsible under the law for the acts done
    by him while in such mental condition.   (p. 469.)

3. CRIMINAL LAW—*Trial—Requests to Charge—Applicability to Evi-
    dence.*

    The accused on the trial of an indictment for murder is not
    entitled to an instruction, propounding the inquiry as to whether
    he was insane at the time of the killing, if the evidence adduced
    by him to sustain such defense lacks tendency to show mental
    unsoundness antedating the drunken spree, in the course of which
    the killing was done, and also to show that intoxication had
    ceased and settled insanity ensued, as a result of habitual indul-
    gence in intoxication.   (p. 472.)

4. SAME—*Circumstantial Evidence—Writ of Error—Verdict—Review.*

    The rule, defining the character and prescribing the quantum
    of circumstantial evidence, necessary to a conviction, saying that
    the facts and circumstances shown must be consistent with the
    hypothesis of guilt, inconsistent with every other hypothesis and
    conclusive in their nature and tendency, operates upon the facts
    found by the jury, not on mere items of evidence adduced, and a

verdict will not be set aside as based on insufficient evidence, or as being contrary to the evidence, when the evidence relating to the facts found by the jury was conflicting and involved the credibility of witnesses, and the court can see that the jury may have found from the evidence facts sufficient to bring the case within the rule just stated.  (p. 473.)

Error to Circuit Court, Raleigh County.

James Kidwell was convicted of murder, and he brings error.

*Affirmed.*

Matheny & Brown, for plaintiff in error.
Clarke W. May, Attorney-General, for the State.

Poffenbarger, Judge:

James Kidwell, under sentence of imprisonment for a period of ten years, for the murder of his wife, pronounced by the criminal court of Raleigh county, complains among other things, of the action of the court in refusing to give certain instructions and to set aside the verdict of the jury because of its alleged error in refusing them.

Testimony having been introduced, tending to show that, for a period of several days, namely, from about the 15th or 18th day of January, 1907, until the first day of February, in said year, when the homicide occurred, he and his wife, Annie Kidwell, the deceased, had been drinking heavily and remained in a state of gross intoxication, so that the prisoner had had delusions and hallucinations, that both had for a long time indulged in periodical drunken sprees of this sort, which occurred about three times a year, and that the prisoner on this particular occasion did not know, after the 6th or 8th day of the spree, what he was doing, except on one or two occasions; the following instructions were asked for by the prisoner and refused:

"The court instructs the jury that if they believe from the evidence in this case that the prisoner at the time of the death of Annie Kidwell was suffering from a diseased and disordered condition of the mind to the extent that his will power and reasoning faculties were, at the time, dethroned and that as a result of said malady he was, at the time,

unable and incapable of understanding the necessary consequences of his acts, and at the time was unable to distinguish between right and wrong, then under such circumstances he would be incapable of committing crime, even though such disorder of the mind was caused from drunkenness, unless it is further shown that said prisoner rendered himself into a state of voluntary drunkenness for the purpose of carrying into effect a preconceived design to commit a felony."

"No. 2 A.  The Court instructs the jury that in the case now on trial the prisoner would not be responsible for the murder of Annie Kidwell even though they should find that he inflicted the wound from which she died if they should further find and believe from the evidence that, at the time of the commission of the act, the said prisoner was suffering from a disordered condition of the mind, which for the time being dethroned his will power and rendered him incapable of knowing right from wrong, even though such disordered condition of the mind was brought *above* by drunkenness, unless it has been made to appear that such disorder of the mind was voluntarily brought about by said prisoner for the purpose of stimulating him to the commission of a felony."

"No. 3 A.  The court instructs the jury that no crime can be committed, under any circumstances, *wher* there is a complete loss of reason and will power."

That drunkenness, however gross or long continued, does not excuse crime, was substantially declared by this Court in *State* v. *Robinson*, 20 W. Va. 713.  It did not, however, preclude the defense of insanity, superinduced by habitual and long continued intoxication.  An instruction, approved by the court, and based upon *Drew's Case*, 5 Mason 28, in which Judge Story delivered the instructions, fully set out in the report of the case, enunciated that doctrine. Judge Story said:  "The question made at the bar is whether insanity whose remote cause is habitual drunkenness is or is not an excuse in a court of law for a homicide committed by the party while so insane but not at the time intoxicated or under the influence of liquor.  We are clearly of the opinion that insanity is a competent excuse in such a case.  In general insanity is an excuse for the commission of

every crime because the party has not the possession of that reason which includes responsibility. An exception is when the crime is committed by a party while in a fit of intoxication, the law not permitting a man to avail himself of the excuse of his own gross vice and misconduct to shelter himself from the legal consequences of such crime. But the crime must take place and be the immediate result of the fit of intoxication, and while it lasts; and not as in this case a remote consequence superinduced by the antecedent exhaustion of the party by rising from gross and habitual drunkenness." It seems to be well established that insanity will excuse crime, though superinduced by habitual drunkenness and only temporary in the sense that it is curable or will naturally pass off; but the distinction between a fit of drunkenness, sometimes called delirium tremens, and temporary insanity, a disease resulting from violent dissipation and indulgence in liquor, technically called delirium tremens, or *mania a potu,* is strongly marked by the authorities everywhere. It is noticed in *Drew's Case,* as may be observed in the quotation just given. In *United States* v. *McGlue,* 1 Curt. C. C. (U. S.) 1, Judge Curtis, afterwards a distinguished member of the Supreme Court of the United States, said: "It is an inquiry of great importance in this case, and, in the actual state of the evidence, I think, one of no small difficulty, whether the homicide was committed while the prisoner was suffering under that marked and settled disease of delirium tremens, or in a fit of drunken madness. My instruction to you is, that if the prisoner, while sane and responsible, made himself intoxicated, and while intoxicated committed a murder by reason of insanity, which was one of the consequences of that intoxication, and one of the attendants of that state, then he is responsible in point of law, and must be punished. This is as clearly the law of the land as the other rule, which exempts from punishment acts done under delirium tremens." Concluding, he said: "For the charge then assumes this form,—that the prisoner committed a murder, for which, though insane, he is responsible, because his insanity was produced by, and accompanied a state of intoxication." In harmony with this is the decision in *Beck* v. *The State,* 76 Ga. 452, holding as follows: "If

the drunkenness produced a temporary frenzy, madness or unsoundness of mind in the accused, he would not be excused or held irresponsible for the act done by him while laboring under such temporary insanity, madness or unsoundness of mind thus produced, it being his own voluntary act. But if the mania, insanity or unsoundness of mind, though produced by drunkenness, be permanent and fixed, so as to destroy all knowledge of right and wrong, then the person thus laboring under these infirmities would not be responsible." In *People* v. *Travers*, 88 Cal. 233, the court said: "As to the instruction asked by the appellant on the subject of delirium tremens, etc., it is sufficient to say that settled insanity produced by a long-continued intoxication affects responsibility in the same way as insanity produced by any other cause. But it must be 'settled insanity,' and not merely a temporary mental condition produced by recent use of intoxicating liquor." In *State* v. *Riley*, 100 Mo. 493, the same principle is stated in the following terms: " Whilst drunkenness is no defense, and does not mitigate the offense, and whilst temporary insanity immediately resulting from voluntary intoxication, does not discharge any one of his responsibility, on the other hand long continued habits of intemperance producing permanent mental disease amounting to insanity, or as the instruction says so weakened or impaired the mind that one committing an offensive has not mind enough at the time to know right from wrong, relieves the party, we apprehend, of responsibility under the law. Insanity of this sort, and thus produced, is the same in law as insanity arising from other causes." Additional authorities to the same general effect are *O'Brien* v. *People*, 48 Barb. 274; *Beasley* v. *State*, 50 Ala. 149; *Chuck* v. *State*, 40 Ind. 263; *Fisher* v. *State*, 64 Ind. 435. A hasty examination of *Bailey* v. *State*, 26 Ind. 422, might create the impression that it states a different rule. The syllabus says: "Where the defendant's mind is so far destroyed by a long continued habit of drunkenness as to render him mentally incompetent intentionally and knowingly to commit the larceny, he should be acquitted, although he was intoxicated at the time he took the property." This, however, is predicated upon the theory that the evidence tended to show insanity, on the

part of the prisoner, before the commission, while in-
toxicated, of the act, for which he was prosecuted. This
would constitute an exception to the general rule that the
accused cannot be held guiltless, if intoxicated at the time
the act was done. The whole doctrine proceeds upon the
presumption of sanity in all men, until the contrary is
proven. No sane man can be excused for an act done
while intoxicated, however gross the intoxication may be.
No matter that he has fits and is wholly unconscious of what
he is doing. He is responsible for his acts, even though he
be entirely oblivious of his conduct and utterly unable to
distinguish between right and wrong; and the common law
made no exception when intemperance resulted in perma-
nent insanity. "The third sort of madness, is that, which
is _dementia affectata_, namely, drunkenness. This vice doth
deprive a man of his reason and puts many men into a
perfect but a temporary frenzy; but by the laws of England
such a person shall have no privilege by his voluntary
contracted madness but shall have the same judgment, as
if he were in his right senses." 1 Hale P. C. 32. This
has been modified by the modern decisions to the extent
above indicated, namely, that when drunkenness produces
disease by which reason is dethroned or the will so impaired
that the victim is no longer able to distinguish between right
and wrong, the law holds him guiltless as in the case of
insanity arising from any other cause. There is a further
qualification of the doctrine, namely, that if a sane man,
not having voluntarily made himself drunk for the purpose
of committing crime, does, while in a state of such gross
intoxication as to render him incapable of deliberation,
commit a homicide, he is guilty of no higher offense than
murder in the second degree. _State_ v. _Robinson._ In view
of these principles, the Indiana decision above mentioned is
no departure from the settled law. The presumption of
sanity may be overcome and established prior to the time of
the commission of the alleged offense, and the drunkenness
of an insane man, would become immaterial. We do not
perceive any departure from, or qualification of, these prin-
ciples in _State_ v. _Kraemer_, 49 La. Ann. 766, 62 Am. St.
664, which holds that: "One who was laboring under de-
lirium tremens at the time of his commission of a crimi-

nal act, so that he did not know or realize what he was doing, is not excused, unless such delirium tremens antedated the fit of drunkenness during which such act was committed."

It must be apparent from these settled principles of law relating to the subject, that the evidence adduced in support of the defense of insanity wholly fails to bring the case within them. None of it tends to show any mental weakness or insanity on the part of the prisoner between his periods of drunkenness. It only shows that, while drunk, he was subject to delusions and hallucinations. That state of mind was nothing more than what the courts term a fit of intoxication, not amounting to settled insanity or *mania a potu*, as it is defined by the law. He was under the influence of liquor at the time of the homicide. He had not ceased drinking and subjected himself to the terrible craving for liquor which is said to afflict those who have been on protracted debauches and produce delirium. There was no evidence, as in *Drew's Case*, that the prisoner fancied himself pursued and his life imperiled, and, if there were, the presumption would be that his condition was due to drunkenness, not disease, for he was still drunk.

Instructions given for the State, conforming strictly to the principles announced in *State* v. *Robinson*, are complained of, under the impression and upon the theory, that the state of the evidence adduced here, respecting intoxication, differs so widely from that of the evidence in *State* v. *Robinson*, that the instructions should have been varied to suit the altered condition. We have no evidence, tending to show voluntary drunkenness produced, for the purpose of carrying out a preconceived intent and design to commit murder, and no instruction presenting that theory was given. In other respects, the evidence is substantially of the same character as that given in the case from the opinion in which the instructions were taken.

A further assignment of error is the failure of the court to set aside the verdict as being contrary to the law and the evidence. The only theory inconsistent with the guilt of the defendant is that of suicide. The death of Annie Kidnell, by violence, at the hands of some human being is

fully proven and not denied. Whether the wounds of which she died were self-inflicted or were given by the prisoner, are the only issues of fact. There is no basis in the evidence for the view that any third person inflicted them. Aside from the possibility or probability of self-destruction, the question with which the jury had to deal was the connection of the prisoner with the killing. The evidence was wholly circumstantial, there having been no eye witness to it, unless the prisoner, who denies the killing, did it. The homicide occurred between twelve and one o'clock of the first day of February, 1907. There was direct and positive evidence to the effect that, on the night of the preceding day, the deceased ran to the house of a near neighbor, apparently in great terror, and knocked for admission, and was almost immediately followed by the prisoner who inquired if his wife was in the house, and was told that she was and had said he had threatened to kill her, to which he replied: "She called me bad names and I am not going to take it," and then left. The deceased remained at that house over night, and the prisoner appeared in the morning, and, after some conversations between them, which the witnesses did not hear, they both went home; but later in the morning the deceased sought refuge again at the neighboring house, pursued by the accused, and shut herself up in an out house, into which he attempted to force his way. She was induced, however, to come out by his convincing her that he was not armed, and then went home with him. Later in the day, the accused went to the store of the company for which he had been working, where he obtained fifty cents and then crossed the river to a village called Prince, where he obtained some liquor. In his absence, the deceased frequently came to the door and sometimes out on the porch, looking anxiously toward the river, apparently for the absent husband. On his return, he entered the house through the kitchen, and, in a few minutes afterwards, emerged from the front thereof and communicated to a child of a neighbor the fact that his wife had been killed. Later, he gave the information to others and accused a young neighbor of the crime, of whose guilt there is not a particle of evidence. About five o'clock in the evening, he was met by J. H. Guinn, a justice of the

peace, just below Prince on the opposite side of the river from Royal, the village in which he lived and in which the homicide occurred, seeking an officer to arrest the man who he said had killed his wife. Guinn searched him and found in his pocket a bloody razor and asked him what he was doing with it, to which he replied that it was the razor with which his wife's throat had been cut. The blood had dried on it, sticking the blade to the handle, so that it was difficult to open it. In explanation of his possession of this weapon, he says that, on entering his home, he found his wife lying on the floor with her throat cut, and, after placing a pillow under her head and taking possession of the razor, he came out of the house by the front door, the knob of which was bloody and went in search of help. Some blood was found on his hands and clothing. The evidence relied upon as tending to prove suicide is that the wound seemed to have been made from left to right, it being deeper on the left than on the right side and high up under the chin, indicating self-infliction, when viewed in connection with the proof that the deceased was right handed and the accused left handed; and that on three previous occasions, the deceased, while under the influence of liquor had threatened self-destruction, once by piercing her heart with a hat pin, again by drowning herself and last by shooting herself with a pistol, all of which threats she had attempted to execute. Some of the criminating evidence was contradicted, but the conflict thus produced was a matter for jury, not court, disposition.

While the law prescribes certain rules for the guidance of juries in dealing with the evidence, it accords to them full and unrestricted power to determine what facts are proven and what not proven, when there is substantial evidence tending to establish them, or the evidence pro and con is conflicting, and is not controlled by some fact or circumstance so clearly and fully established as to leave no possible doubt of its existence, and of such character as makes it necessarily rule the whole case. The credibility of witnesses is for jury determination and no other, when any link or fact depends upon that question. *Fulton* v. *Crosby & Beckley Co.*, 57 W. Va. 91; *State* v. *Flanagan*, 26 W.

Va. 116; *State* v. *Baker*, 33 W. Va. 319. Here the evidence is circumstantial and the guilt of the accused arises by inference, it is true, but that inference comes from the facts found by the jury, and what they were the court cannot know with any degree of certainty. Much of the prisoner's testimony, conflicting with that of the state, may have been cast aside by the jury as false and worthless, and no doubt was. Thus it becomes manifest that the essential facts and circumstances found, as proven by the evidence, may have been perfectly consistent with the hypothesis of guilt, inconsistent with every other, conclusive in their nature and tendency, and, therefore, such as to warrant and call for a verdict of guilty in strict conformity with the rule defining the character and prescribing the quantum of circumstantial evidence, necessary to conviction. There may have been no strong motive for the commission of the crime, but there was the element of drunkenness, accounting for the absence of deliberation and motive, and yet not relieving from responsibility. Though the couple may have been perfectly devoted to each other, as stated by the accused, he may have killed her in his drunken fit. The jury may have found that he nevertheless pursued her to the neighboring house in anger and resentment of some fancied injury or insult. The deadly weapon was found in his possession and he had falsely accused another person of the murder. Whether these were incriminating circumstances depends upon the findings of the jury concerning the mental condition of the accused at the time, and many witnesses say he appeared to be perfectly sane and rational. The rule invoked against the verdict operates on the facts found, not on the mere evidence adduced, and as the court cannot know what facts were, in the opinion of the jury, proven and what not, it is obviously impossible to disturb the verdict on the theory that the circumstances were not inconsistent with the hypothesis of suicide.

Seeing no error in the judgment, we affirm it.

*Affirmed.*