## MOTT v. STATE.

No. A-11318. May 16, 1951.

(232 P. 2d 166.)

D. L. Grace and I. S. Simmons, Fort Smith, Ark., and Quinn M. Dickason, Tulsa, for plaintiff in error.

Hugh M. Bland and John Harris, Fort Smith, Ark., amici curiae.

Mac Q. Williamson, Atty Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

POWELL, J. The plaintiff in error, Milburn J. Mott, was charged by information filed in the district court of Tulsa county with the crime of murder, was tried to a jury, convicted, and his punishment was by the jury fixed at death, and thereafter judgment was by the trial court entered accordingly. Appeal has been duly perfected to this court, and execution stayed pending outcome of the appeal. The plaintiff in error will hereinafter be referred to as defendant.

Counsel for reversal urges six specifications of error, and being:

"(1) That the court erred in refusing the defendant his requested continuance of the case;

"(2) The court erred in refusing to sustain defendant's motion to quash the jury panel;

"(3) That the court erred in denying defendant's demurrer to the evidence of the State;

"(4) That the court erred in refusing to sustain the demurrer of defendant at the close of all the evidence.

"(5) That the judgment is contrary to the law.

"(6) That the judgment is contrary to the evidence."

While the record contains nearly 700 pages, and most of the exhaustive briefs of defendant are devoted to reviewing and quoting the evidence, we find no material conflict in the same, so far as concerns the details of the murder and the fact that defendant was the murderer. Stripped of all legal verbiage, the information charged that on the 8th day of March, 1949, the defendant effected the death of his daughter Mary Frances Mott, age six years, by cutting her throat with a twelve-inch butcher knife.

Considering the evidence on behalf of the state, we find:

That the defendant's wife, Nettie Loretta Mott, age 28, her five children ranging in age from ten to four years including twin girls eight years of age, his mother-in-law Jane Ethel Birch, age 48 years, and her twelve-year old daughter, lived at Sand Springs, in a one-room ground floor apartment of the three-story cement block Alvarado Apartment house, the room being formerly a store room. These people cooked, ate and slept in this one room. A community bath and toilet was available nearby in the building. Mrs. Birch had a husband but did not live with him. She had another daughter, Lucille Birch, age 31, who lived in an upstairs apartment of this building.

It appears that Mrs. Mott took this apartment about the time her husband entered the military service in 1942. After getting out of the army, defendant had not been able to make a go of supporting his family, and could not live with the family and get along with his mother-in-law. But in November, 1947, he did persuade his wife to leave with him for Arizona. They took three of the children. Defendant and his wife worked at various jobs, including cotton picking, but in May, 1948, the wife and children returned to Sand Springs and the wife got a job at a local cotton mill, and she and her mother moved into the apartment in question. The defendant proceeded to California and purchased an old car, and on stepping out of it on a highway, was struck by a motorcycle and severely injured, and spent about five months in a hospital. There was no room in the one-room apartment for the defendant, and it is apparent that he was not financially able to support his family, but he did visit his family during the Christmas holidays and his mother-in-law moved up with her other daughter, but finally forced defendant out of the apartment, and he lived in a hotel a short time, and his wife would visit him there. Defendant returned to California for further medical treatment, but hitchhiked back to Sand Springs, arriving on the evening of March 7, 1949, at about 5 o'clock.

Jane Ethel Birch, the mother-in-law, testified that the defendant, on returning, visited his wife's apartment; witness, the wife and children, and two of his wife's girl friends being present. Mott stayed until about 11 p.m. Witness testified that before defendant left he asked the children if they would like to see him beat their mother up again. Witness stated that the defendant returned to the apartment again the next morning about 8 o'clock; that he stayed until his wife left for work at the cotton mill about 2 o'clock in the afternoon, that during his stay he slapped the baby because he pulled on his daddy's tie while defendant was dressing; that he returned to the apartment around 5 o'clock in the afternoon, but stayed for only about five minutes, talking to the baby. The wife was not present. About 11 p.m., the five Mott children were in bed, as was her twelve-year-old daughter. Mrs. Mott was due home from work at 11 p.m.; that witness saw Mott cross the street to a beer joint; that shortly afterwards Mrs. Mott arrived home from work and Mott came over and knocked on the front door, and Mrs. Mott opened the door. The screen was fastened. She told defendant to go on home and go to bed, that he had been drinking and that she was not going to let him in; that he stated he wanted to come in and talk sense, and the wife told him to go on and they could talk

148

the next day; that defendant then said: "You see this?" and she slammed the door and said: "Mother, he has a gun." Witness further testified that Mrs. Mott fastened the door and that defendant commenced to kick the door in and that glass went flying. Witness and Mrs. Mott then ran out of the north door and sought refuge in another apartment, finally being admitted to the Moss apartment where they stayed a few minutes until someone knocked and Mr. Moss asked who it was and that she heard Charles Wayne Mott, the ten-year old son, say, "It's me." On being admitted he stated: "Grandma, Daddy has cut Frances' throat." Witness, Mrs. Mott and several others then went to Mrs. Mott's apartment and found Mary Frances Mott dead and her throat cut so that the spine could be seen. Witness identified a blood-stained butcher knife that was found on the floor of the Mott apartment at one end of the divan, and she stated that she had owned it for three or four years and kept it in a drawer next to the cook stove.

Lucille Birch testified that she was 31 years of age, lived up stairs in the same apartment building as her sister Mrs. Mott; that some time after 11 o'clock the night of March 8, 1949, and while she was asleep someone opened the door and came into her apartment. She jumped out of her bed and screamed; that she recognized the man standing in her room as Milburn J. Mott; that she threatened to call the police and he drew a gun and said: "You will never live to call the police." That she screamed again and ran to her landlady.

Charles Wayne Mott testified that he was ten years of age; that Wilburn J. Mott was his daddy; that he attended Sunday School regularly and knew what it was to tell the truth and understood that little boys who told lies would be punished. He stated that on Tuesday night, March 8, 1949, he and his brother and sisters were sleeping in his mother's apartment, he and his sister Mary Frances sleeping in the same bed; that in the night he was awakened and looked and saw his father standing in the middle of the room. He further testified:

"Q. Now tell us what your daddy did when you saw him in the middle of the room. A. He looked around the room and then he looked at our bed and then he looked at the two doors and then he went and latched the front door and the back door. Q. He latched the front door and the back door? A. Yes, sir. Q. Point out where the front door and the back door is? A. This is the front door and this is the back door. Q. He latched both doors? A. Yes, sir. Q. Then what did he do? A. He went over to the knife, fork and spoon drawer, or rather over to the sink, and opened the drawer and got the butcher knife. Q. Point out in the picture where the knife, fork and spoon drawer is. A. Right there. Q. How do you get into it? A. Open this door here and there is a drawer here and pull it out and that is where the butcher knife was kept. Q. He went over there and got the butcher knife? A. Yes, sir. Q. After he got the butcher knife, what did he do? A. He came over to our bed and bent over Frances. Q. Did you see anything in his hand when he came back to the bed? A. Yes, sir, I saw a butcher knife. Q. What did he do when he came over to your bed and bent over Frances? A. He started to cut her and I got my head under the cover. Q. When you had your head under the cover, did you hear anything? A. I heard a noise like rubbing the palms of your hands together and then I heard some kind of a sucking noise. Q. Can you demonstrate the noise? A. Noise kind of like this (demonstrating). Q. How long did you keep your head under the covers? A. A few minutes and I looked out and he was coming toward me. Q. Did he have anything in his hand? A. He had the butcher knife in his hand. Q. Did you say anything? A. I said 'Daddy! Daddy! Don't do it!' Q. Are you sure that was your daddy that came in there and cut Mary Frances with a butcher knife in his hand? A. Yes, sir. Q. What did you say when he came towards you? A. I said, 'Daddy! Daddy! Don't do it', or something like that. I am not sure. Q. What did he do? A. Tried to pull the cover off of me. Q. What did you do? A. Held onto the cover to prevent him from pulling the

cover off of me. Q. What did he do? A. I guess he threw the knife by the divan. Q. Did you hear it fall? A. Yes, sir. Q. What did you do? A. I heard him leave and I got out from under the cover. I got out of the bed and kind of turned over by the side of Frances. Q. Did you see Frances? A. Yes, sir. Q. Was there any difference between her then and when she went to bed? A. Yes, sir. Q. What was the difference? A. A hole in her neck and blood spreading. Q. What did you do? A. I started to latch the door and I thought of Granny and Mama and I went to the bathroom door and locked that and went out through the hall to Mrs. Moss.' "

Witness further identified the butcher knife. On cross-examination he testified that he could smell liquor on his daddy's breath, his daddy's face was red and that he was drunk.

James Henry Saylor testified that he was a bartender in a place just across the street from the Mott apartment in Sand Springs and that around 11 p. m., March 8, 1949, the defendant came in and drank a bottle of beer, went out, came back soon and drank another bottle and purchased two to take with him; that witness noticed that defendant had a pistol in his right hand hip pocket, but defendant talked to a Mr. Harris, did not stagger and conducted himself in a normal manner.

Buck Norris, shoe repairman, Sand Springs, testified that his place of business was about 100 feet west of the Mott apartment and on the same side of the street; that on the night the Mott child was killed, and a short time prior thereto, the defendant came in his shop to pay a 40 cent bill that he owed, that he took a gun out of his pocket and witness asked him to put it back as it might go off and defendant left, but soon came back with two bottles of beer and witness drank one and defendant drank the other. Defendant then started to leave and witness said: "I will be seeing you," and defendant answered: "I may never see you any more."

Brick Fowler, investigator for the county attorney's office, testified that on the morning of March 9, 1949, he saw defendant in the county attorney's office, Sheriff George Blaine also being present; that defendant was not coerced or promised anything, but did agree to make a statement, that witness propounded the questions to him and Miss Lamm, the reporter, took the questions and answers in shorthand, and then transcribed the same, and thereafter each page was read by the defendant and initialed and that he swore to the entire transcript containing some fifteen legal-size pages. Miss Lamm, the reporter, identified the statement, and both she and the sheriff corroborated the statement that the same was voluntarily given and without coercion or promises of any kind.

Defendant in the confession stated that he was 33 years of age, that he had gone to California the previous December to have a rib removed, he having been hit by a motorcycle while in California, and in the same accident had his leg broken, a shoulder broken, and previously having undergone several operations by reason thereof. He was asked:

"Q. Melburn, what was your reason for returning to Tulsa this last time? A. Well, I thought I would make my wife understand in order to get those children out in a house. I have been trying that for some time. Five years, to be exact, to get her out of the place where she was at. I tried five years in service to get her out and wanted the folks to go out on a farm but she had too much night life and clubbing to do. She wanted to stay in town. She called her sister and they got her back. She didn't think I should have anything to say toward the children at all. Q. When you left California, how did you come to Tulsa? A. Hitch hiked."

Defendant further stated that his wife would not agree to live with him any more, and wanted a divorce. On March 8th he took a streetcar to Tulsa, bought

a .32 calibre pistol and shells, drank around 20 or more bottles of beer, and he stated that he intended to get his wife and children away from his in-laws or take the in-laws out. He admitted that on returning from Tulsa around 11 p. m. he went to his wife's apartment.

"Q. Was anyone home at the house when you got there? A. My wife answered the door and then shut it. Told me I couldn't come in. Q. And what did you say? A. I kicked the door in and went in and she went out. Q. Did you have the gun in your hand when you went in? A. I don't remember. I think I pulled it up. Q. How did you get in the house? A. Kicked the door in. Q. Did you break the top glass with the pistol? A. I may have, I don't know for sure, I stuck my hand in and pulled the sliding latch. Q. When you got inside the house, Melburn, what did you do? A. I looked for my mother-in-law and she was up and gone and wife also. I wasn't figuring on harming her. What I really intended—she was going to put in for divorce the next morning and I was going to try to get her to wait. Q. What else did you do while inside the room? A. I went to the kitchen sink and there got the knife. Q. Melburn, you put your initials on a knife here. To the best of your knowledge, was that the knife you got out? A. I couldn't say it was the knife. The guys said they got it there. Q. There are some stains resembling blood on it. Is that correct? A. Yes. Q. After you got the knife what did you do? A. Used it then, I guess. Q. Tell us in your own words just what did you do with the knife? A. I just went over and drug the knife across her neck and started toward the boy, and he woke up and said: 'Daddy, please don't do that' and put his head under the cover and I went out of the building and realized what I had done. I went out. Q. Did you know which child you were cutting? A. Afterwards, I did. Q. Did you have any reason for this? A. No reason whatsoever. Q. Were you mad at anyone? A. Mad at her folks. Had been for some time. Every time I got around them they made me mad. Something was stored up that let go in my weakened condition. Q. And the child you cut, what was her name, please? A. Mary Frances. Q. And she was your own daughter? A. Yes. Q. Now did you swing this knife at her neck or hack at it? A. No. Q. Did you drag it across her neck? A. I just gave it a quick drag. Q. One motion or several motions? A. One, I think, or maybe two. Q. Did your daughter make any outcry? A. No sign at all. Q. Then you say you started after Charles? A. Right. Q. What [why] didn't you do the same to Charles? A. because he hollered and when I heard his voice I realized what I had done—what had taken place. I don't guess I meant to do what I did. Q. Do you know what you did with the knife? A. No, I don't. Evidently I threw it down. Q. After you had done the cutting and before you left the room, what did you do then? A. After? Q. When you were still inside the room? A. I didn't do anything except start after the other child. Then I left. Q. Did you go out the back way? A. There is only the front way out. Q. I thought there was a back tunnel. A. There is a back tunnel, but I couldn't get out that way. You could but you would have to have the cooperation of someone else. Q. Then you left out the front door? A. Uh, huh. Q. Was anyone waiting for you or did you see anybody? A. No. Q. Where did you go, Melburn? A. Down the street, across the river towards Skiatook, I think. Q. Across the river? A. Across the bridge. Q. That's south from the home, correct? A. I don't know. Q. Do you know where Keystone is? A. I think so. Q. I will ask you if that isn't where the officers picked you up? A. Where? Q. In Keystone. A. No. Q. Where did they pick you up? A. It was on the Keystone road, I heard them say, but this side of Keystone."

Defendant admitted throwing away the gun, his pocketbook, and losing his wrist watch.

There was other corroborative evidence, introduced by the state, including certain pictures of the apartment, inside and outside views, and pictures of the child showing the details of her slashed throat, the blood-soaked bed, testimony of the undertaker, of the officer who apprehended defendant as he walked on the Keystone road a few hour following the murder, etc., and testimony of neighbors who observed defendant break into his wife's apartment and who

saw him depart thereafter. The state rested and the court overruled a demurrer to the evidence interposed by counsel for defendant.

The defense used ten witnesses. It was sought to show that the accused, if he committed the act charged, was insane. Counsel in opening statement said to the jury:

"Mr. Dickason: Gentlemen of the Jury: You know pretty well what we will tell you on behalf of the defendant in this case. It will be the contention of the defendant in this case that this boy has had a number of accidents to his head, especially in his youth. The evidence will show by his parents that he dived off of a bank and struck his head and had effects from it thereafter and was working in a cane field at one time and overcome by the heat and has had a number of accidents and in California he had a car accident and that is what caused the brace to be on his foot and he suffered a head injury at that time. He left his family and went in the Army and was in the battle of the Bulge and his experience has affected him. He has drunk more and has been highly nervous. We will show his wife has continuously nagged him and tried to run him off and was unfaithful to him while he was in service and admitted it when he came back. It worried him about the environment his children were in and she told him to stay away from out there; that he would get in her way. She was carrying on and did not want him around and all of these battle scars and nervous strain he has gone through, the nervous condition and all, he has not been a normal man for the last few years and it bothered and worried him about his children growing up in that environment around that grandmother and the aunt and the home they were in out there and apparently, from all the evidence, his mind slipped on that night and he tells me somewhere in the afternoon he quit remembering anything and does not remember anything that did occur, if he is the man, and he will show by reason of his mental condition, he could not have formed any intent to commit the crime and to kill the child. He must have had some violent upheavel that rather than have the children grow up in the environment they were in, to take them all out of it. We do not condone it but it is excusable and he is not responsible for his acts and he is more to be pitied then to be sent to the electric chair."

To substantiate the statement concerning defendant's head injuries, etc., counsel offered the testimony of Mrs. Gatha Mott, defendant's mother. She also testified that she had a brother and an uncle who died of insanity. She was the mother of ten children, and had brought them up on farms in Arkansas and in Oklahoma. She claimed that her son had spent a good bit of time with them off and on since his return from the military service, and that he had been having family trouble and was nervous and had cried some. Her testimony indicated great frustration on the part of her son.

J. Mott testified that the defendant was his son, that witness then lived in Arkoma, Oklahoma, that his son had lived with him until he was about 24 years of age in 1938, when he married; that in 1941 he moved to Sand Springs and in 1942 entered the military service; that after his son got out of the military service he was highly nervous and acted peculiar. Said the father, concerning what his son told him about his family troubles:

"He told me about the way his wife was running around with other men and her conduct and the place his children had to be raised up in; that it was not a decent place for them to be raised in and it seemed to worry him because he could not get them out. He talked to his wife and tried to get her to move them out to a place that was decent and she would not do it, so he told me."

This witness also stated that Mrs. Mott's mother could not get along with her husband and that they separated and Mrs. Birch took up with another man and ran around over the country with him before she moved to Sand Springs,

and that one of her unmarried daughters who lived with them at Sand Springs gave birth to a baby out of wedlock.

S. L. Rathey testified that he lived at Arkoma and had known the Motts since in 1932. He was asked:

"Q. What did he [the defendant] say or do, that made you think that he was not right? A. He did not do or say anything about the army but about other things and looked this way (indicating) like somebody was after him. I remember I thought he was kind of nuts."

C. A. Corley of Spiro testified that he had known the defendant about 16 years. His testimony was about like that of witness Rathey.

Wilma Birchfield of Sand Springs, sister of defendant, testified that she saw her brother after he was injured in California. She stated: "I could not get him to talk about any one thing. He would go back to the subject of his troubles and his children and how much he loved them. * * He did not sleep. He would get up three or four times in the night and smoke a package of cigarettes and moan and groan in his sleep." She stated that defendant would break down and cry about his children, and that his wife had sued him for divorce three or four times. She stated that defendant thought everyone was against him, and that she was afraid of him because he acted unbalanced and looked wild out of his eyes. She stated that defendant talked about the immoral conduct of his mother-in-law, her daughter, and how he wanted to get the children out from under such influence.

Mildred Bailey, another sister of the defendant, his brother-in-law Edward Bailey, and his younger brother, Argos Mott, each testified substantially as had Mrs. Birchfield.

Milburn J. Mott testified in his own defense, such record requiring 79 pages. He stated that he was born in Booth, Arkansas, but moved to Oklahoma when he was 16 years of age, was brought up on a farm, married his wife who lived on a neighboring farm in 1938; admitted that he had her pregnant at the time and that her mother had requested the marriage; that he and his wife lived by themselves on a farm for one year, then on his wife's mother's place, then moved in with his father for six or eight months, then moved to Stony Point, then to Sand Springs. For a short time he and his wife lived alone, but later moved to the Alvarado Apartment building where his mother-in-law lived, and except for a short time spent in Arizona, his wife and children had lived there ever since.

Witness testified that his mother-in-law, her three daughters, and a grandson lived in the same apartment building, and that his mother-in-law was separated from her husband and had men friends stay with her, as did two of her daughters, and that one of them had a venereal disease and bathed his children; that all this worried him considerably. He further stated that he served in the army 22 months, part of the time overseas; that he was discharged in 1945, but at the insistence of his wife re-enlisted and served 15 months more, being mustered out in 1947. He received an honorable discharge, and had been a sergeant. He testified to head injuries and five months hospitalization therefor in California, and about his wife filing suit for divorce four times. He stated that while he was in the Army his wife worked some at the Union Bus Station terminal. He was asked about her conduct, if anything. He stated:

"She came back and told me about having sexual relations with a number of men. What her idea for this was, I don't know, but she told me, named in particular, but I don't remember but one name. I remember in particular she said it was Campbell, because she said he had an extraordinarily large private

and it hurt her every time she had sexual relations with him, but still she went out with him times after that.

"Q. She said she could pick these dates up at the bus station? A. Yes, sir. She said she went out with soldiers and sailors coming through and she liked to go with them one night because they had plenty of money and could show her a fast life and one particular guy had a brand new car and she went out with him and she had sexual relations and didn't even get up her passion. Q. Do you remember her having a sailor out at her home? A. Yes, sir. Q. What was that incident? A. My two twins, Ila and Anna. My wife stepped out and they said, 'Daddy, Mama has been doing something wrong' and I did not have any idea and they said she carried out a blanket out to the front with the sailor and they thought they were asleep and they came back in the house and got in the bed and went up and down in the bed. Of course, the children did not know what was going on."

Defendant further claimed that his wife was ashamed of him after he was crippled up in the motor accident in California. On cross-examination witness was asked in detail concerning his confession just after his arrest. He denied remembering making the statements attributed to him. In fact, he claimed that his mind was a blank after he broke into his wife's apartment. He did admit his signature to the confession. He denied asking the children if they wanted to see him beat their mother again. He claimed that he had been threatened by his wife and mother-in-law. He stated: "My wife said she could have me bumped off and I had better get out of town and stay out and not be seen. She said she had means of getting me bumped off; that I did not know them but they knew me." He stated that thereafter he purchased the gun. He claimed that his mother-in-law kept a .38 pistol which she would load when he was around.

The defense produced Dr. Shelly Grant, semi-retired physician and surgeon of Ft. Smith, Arkansas, and attempted to show by him that the defendant was insane at the time of the murder in question. The facts of his head injury in his youth, and being under shell fire in Germany and being struck by the motorcycle, and his family troubles, and his drinking, and the fact of insanity in his mother's family, were recited. The doctor evaded a direct answer to the hypothetical question propounded. Finally the court stated: "The question is whether or not, at the time he committed the act, if he did commit it, on March 8, 1949, was he sane or insane?" The witness then, after attempting qualifying answers, stated: "I think he was temporarily insane."

On cross-examination witness was asked:

"Q. Dr. Grant, going back to the answer that you made to the question that Mr. Grace asked you a while ago, to the time, in your opinion, in regard to Milburn's mental condition, immediately prior and during the time that he cut his daughter's throat, you are not sure, are you Doctor, that he was unable to distinguish the difference between right and wrong and realize the consequences of his act, are you? A. It is a hard question to answer alright, but I cannot get away from that thought, that a man who did know the enormity of his crime and his own child asleep at six years of age, at that tender age, would be mean enough to cut her throat unless he was worked up to that point. It is hard to answer. Q. You are not sure that he was able to distinguish the difference between right and wrong and realize the consequences of his act immediately before and during the time he was cutting the throat of his daughter, are you? A. You have not got any harder nut than that to crack up your sleeve, have you? A. No, sir. Q. Is neurosis or psychoneurosis a form of insanity?"

After again evading the answer, the county attorney requested: "Please answer my question", and witness stated: "A. It is a mental condition." Counsel

further asked: "But are neurosis or psychoneurosis forms of insanity?" And witness answered, "Yes, I think so."

On rebuttal the state produced a number of witnesses. Lake Bryant, chief jailer, testified that he had been requested to constantly observe defendant after he was placed in jail. He stated that defendant spent his time playing cards and dominoes; that he had never seen or heard him cry, and that he showed no appearance of remorsefulness.

Assistant jailer Seth Treadwell testified substantially as jailer Bryant.

Dr. F. M. Adams, Medical Superintendent of the Eastern State Hospital, Vinita, testified that he had been superintendent 36 years and was a registered psychiatrist and during the time he had handled 21,000 mental patients in the hospital and had 2,410 mental patients under his supervision at that time. He stated that he had talked with the defendant and examined him twice, and during the trial had observed the defendant and heard him testify. Further questions were asked and answers were given as follows:

"Q. With reference to the first time you talked to him and with reference to the time he testified on the stand today, is there any difference in him and the way he was on those two occasions? A. Yes, sir. He talked to me very friendly, particularly on my first examination. I did not find any defects of memory at that time. He gave me dates very readily. Q. The first time you talked to him, he had no lapse of memory? A. No sir. Q. He remembered dates? A. Yes, sir. Q. And answered your questions friendly and voluntarily? A. Yes, sir. Q. You have heard him testify today? A. Yes, sir. Q. Is psychoneurosis or neurosis a form of insanity? A. No, sir, that is a nervous disease in which the emotions are affected and upset, and insanity, of course, is a disease of the mind itself. Neurosis or psycho-neurosis are one and the same thing. They are not insanity. Q. What is the tendency of acute alcoholism to develop into insanity? A. Of course they have to drink. over a long period of time and consume almost daily a large quantity of alcohol. Q. You have examined this man on two different occasions, privately, and you have observed him here in the court room all throughout this trial. You have heard the testimony on behalf of the State and heard the testimony on behalf of the defendant himself and the other witnesses. You have heard his story concerning the killing of this child. You have talked to him personally about it and read the statement of defendant introduced in evidence by the State in chief in this case. What is your opinion, Doctor, based on all you know and have seen and heard about this case? What is your opinion as to whether this man is sane or insane? A. I think he is sane. Q. What is your opinion as to temporary insanity? A. There is no such thing as temporary insanity. Q. Is there such a thing known to medical science as temporary insanity? A. No, sir. Q. A man is either sane or insane? A. That is right. * * * Q. Can you testify to the court and the jury, in your opinion, at the time Milburn J. Mott killed his child, he was sane and knew right from wrong and was able to form an intent to kill the child? A. I so testify, under oath."

Dr. Harold L. Beddo. specialist in psychiatry, testified that he had examined the defendant on March 9, 1949, the day following the murder, and found his memory good; that he talked freely at that time and that his answers were far different than at time of trial. Witness testified substantially as Dr. Adams and gave it as his opinion that defendant was sane and could distinguish between right and wrong and understood the consequences of his acts at the time he killed his daughter.

Considering the contention that the court erred in refusing the defendant his requested continuance of the case, we find that the accused was arraigned on March 23, 1949, and that the district judge appointed Q. M. Dickason, the public defender, as counsel to defend him. Defendant waived time to plead.

On April 25, 1949, the day set for the trial, a motion for continuance was filed on behalf of the defendant. It was set out in the motion that defendant had been without counsel until the public defender was appointed on March 23, 1949; that said attorney was overworked and did not have funds or time to make proper investigation and preparation, and that an attorney, D. L. Grace, of Ft. Smith, Arkansas, had finally been employed by defendant's father and needed time to prepare for trial, and it was alleged that the radio and press had stirred up the public so that it would be impossible to get a unprejudiced jury. A 90 days continuance was requested. The motion was overruled and the defendant was ordered to trial.

The record discloses that on March 9, 1949, when defendant was arraigned on the preliminary information in the court of common pleas of Tulsa county, that Mr. Dickason, the public defender, was at that time appointed to represent defendant, and that the preliminary examination was held on March 16, 1949. The case was thereafter set for trial for April 25, 1949.

This court is committed to the rule, many times upheld, that an application for continuance on the ground of want of time to prepare for trial is addressed to the sound discretion of the trial court, and the ruling of that court will not be disturbed on appeal, unless an abuse of discretion is shown. See Phillips v. State, 71 Okla. Cr. 287, 111 P. 2d 203; Lemke v. State, 56 Okla. Cr. 1, 32 P. 2d 331. From the facts recited, we cannot say that the court abused its discretion.

Counsel contends that the court erred in refusing to sustain defendant's motion to quash the jury panel because of the contention that defendant was entitled to have on the jury some jurors who had served in battle in either World War I or World War II. No authority is cited and the argument advanced is not convincing, and in fact appears wholly lacking in merit, and is rejected.

Counsel complains of the admission of certain photographs. When the pictures were offered in evidence only a general objection was interposed. Counsel questioned the photographer at length, the questioning indicating counsel's apprehension as to whether the pictures correctly showed the scene of the crime immediately following the murder. The evidence indicated no changes had been made in the arrangement of the room following the murder and up to the time the pictures were made. The evidence as to defendant's guilt is overwhelming without consideration of the pictures.

On appeal counsel argues that the nature of the wound of the child was otherwise proven and that the photographs were without probative value and that their admission was prejudicial and tended to inflame the jury. The defendant on trial, did not admit the killing. There was a question as to how the injury was inflicted and while the pictures may have tended incidentally to inflame the jury, this court has many times held that when a photograph is shown to be a faithful reproduction of whatever it purports to reproduce, it is admissible in evidence, as an appropriate aid to the jury in applying the evidence and that this is equally true whether it relates to persons, things, or places. See Seals v. State, 92 Okla. Cr. 272, 222 P. 2d 1037; Roberts v. State, 82 Okla. Cr. 75, 166 P. 2d 111; Morris v. State, 6 Okla. Cr. 29, 115 P. 1030; People v. Harris, 219 Cal. 727, 28 P. 2d 906; Burgunder v. State, 55 Ariz. 411. 103 P. 2d 256; People v. Smith, 15 Cal. 2d 640, 104 P. 2d 510.

This court has held that the introduction of photographs taken subsequent to a homicide is largely in the discretion of the trial court, and unless this discretion is abused, it will not be a cause for reversal. Jackson v. State, 67

Okla. Cr. 422, 94 P. 2d 851; Roberts v. State, supra; Langley v. State, 90 Okla. Cr. 310, 213 P. 2d 886.

It is further argued that the court erred in not giving defendant's requested instructions. An examination of the instructions given discloses that the court gave correct instructions covering the theory of defendant's case. The court did refuse to give an instruction defining reasonable doubt. We have not looked with favor on the giving of an instruction attempting to define the term, and have held that it is not error for the trial court to fail or refuse to define the term "reasonable doubt" whether requested to do so or not. Andres v. State, 51 Okla. Cr. 229, 1 P. 2d 178; Wise v. State, 34 Okla. Cr. 284, 246 P. 656.

The following instructions permitted the jury to determine whether or not defendant was so intoxicated as to preclude a premeditated design and intent to take human life, and to determine whether defendant was sane or insane at the time of the murder:

"No. 7. You are instructed that homicide committed with a design to effect death is not the less murder because the perpetrator was·in ·a state of voluntary intoxication at the time. However, one of the elements of the crime of murder is an intent to effect the death of the person killed and if you find that the defendant at the time of the killing was so completely drunk as to be totally unable to form an intent to kill, or if you have a reasonable doubt thereof, you should not find the defendant ·guilty of murder. The homicide, under such circumstances, unless otherwise excusable, would amount to manslaughter in the first degree.

"No. 8. You are instructed that the opinions of the expert witnesses which have been introduced in evidence herein are to be considered and given weight by you only if you find the facts assumed in the hypothetical questions or case histories are true.

"You are further instructed that the opinions of expert witnesses are to be considered by you in connection with all the other evidence in the case, and you are not to act upon such opinions to the exclusion of the other testimony. In determining the weight of the testimony of expert witnesses, you are to apply the same rules to their testimony that are to be applied to the testimony of other witnesses who have testified before you in this case, and you are to give such testimony such weight as you may deem proper.

"No. 9. As one of his defenses the defendant contends that if he did commit the crime charged, he is not guilty by reason of his insanity at the time of the commission of such crime.

"In this connection, you are instructed, as follows: Under the law of this state an act done by a person in a state of insanity cannot be punished as a public offense, and the following persons are incapable of committing crimes: lunatics, insane persons and all persons of unsound mind, including persons temporarily or partially deprived of reason, upon proof that at the time of committing the act charged against them they were incapable of knowing its wrongfulness.

"The law presumes every person to be sane and able to distinguish right from wrong as applied to any particular act, and to understand the nature and consequences of such act, until a reasonable doubt of his sanity is raised by competent evidence, and it is an essential ingredient of a crime that a person, to be guilty of such crime, must have at the time of its commission, sufficient mental capacity and reason to enable him to distinguish between right and wrong as applied to the particular act that he is then about to do. It is not every derangement of the mind that will excuse one from punishment for the commission of crime. Although one may be in a diseased or unsound condition of mind brought on by any condition or produced by any cause, if at the time he commits the crime he knows and understands the nature and consequences

of his act, and at the time knows it is wrong and criminal to commit such act, and has sufficient mind to apply that knowledge to his own acts, and to know that if he does commit such act he will do wrong and subject himself to punishment, then and in that event such diseased or unsound condition of mind is not sufficient to excuse him from criminal liability.

"When the plea of insanity is interposed, the burden of proof is on the defendant, unless the evidence on the part of the State is sufficient for that purpose, to introduce sufficient evidence to raise in the minds of a jury a reasonable doubt of the defendant's sanity. It is not required that the defendant shall prove his insanity to the satisfaction of the jury beyond a reasonable doubt, or by a preponderance of the evidence. It is sufficient if only he introduces sufficient evidence to raise in the minds of the jury a reasonable doubt of his sanity, and when this is done the burden of proof is on the state to prove the sanity of the defendant by competent evidence, beyond a reasonable doubt, before the jury will be justified in convicting the defendant."

We conclude that there was ample testimony, both lay and expert, to show that the defendant was not insane at the time of the commission of the crime charged, or that he was so intoxicated as to render the mind incapable of forming a premeditated design to effect the death of the deceased, or some other person.

The testimony of the doctor offered by the defense was not of much value. He displayed a lack of knowledge of mental diseases and psychiatry.

Dr. Adams, witness for the state, did say that the fact of defendant's being under the influence of alcohol accounted for his committing the crime, but that the evidence failed to show that defendant had been for a long time drinking sufficient quantities of alcohol to cause his brain to become diseased, and it was his opinion that the accused knew what he was doing at the time of the crime.

In this jurisdiction voluntary intoxication is no defense or excuse for committing a crime. Tit. 21 O. S. 1941 § 153 provides:

"No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his having been in such condition."

In the case of Cheadle v. State, 11 Okla. Cr. 566, 149 P. 919, L.R.A. 1915 E, 1031, this court held for insanity due to intoxication to be a defense, "it must be insanity caused by chronic alcoholism and not a mere temporary mental condition."

In the body of the opinion, this court, through Doyle, J., said:

"Alcoholic insanity, or mental capacity produced by voluntary intoxication, existing only temporarily at the time of the commission of the homicide, is no excuse or defense in a prosecution therefor. Drunkenness is one thing, and the disease of the mind to which drunkenness leads are different things. Temporary insanity, occasioned immediately by drunkenness does not destroy responsibility for crime, where the defendant, when sane and responsible, voluntarily makes himself drunk. To constitute insanity, caused by intoxication, a defense to an indictment or information for murder, it must be insanity caused by chronic alcoholism, and not a mere temporary mental condition. The distinction between a fit of drunken frenzy or madness, commonly called, 'delirium tremens.' and temporary delusional insanity, a disease caused by excessive and long-continued indulgence in alcoholic liquors, technically called, 'delirium tremens,' or 'mania a potu,' is well defined by the authorities and text-writers."

Cited was State v. Kidwell, 62 W. Va. 466, 59 S. E. 494, 13 L. R. A., N. S., 1024, and Wharton and Stille's Medical Jurisprudence, § 940.

Counsel complains bitterly as to certain remarks made by the assistant county attorney in his closing argument. The entire argument of counsel for the state was reported. Particularly complained of were the following statements by Mr. Devine:

"A hell-raising speech. What for? A hoodlum. A murderer." [Referring to speech of counsel for defendant.] A semi-shotgun wedding. [Referring to defendant's marriage.] As you have heard us lawyers say to the court, we cannot use her, his wife, in testifying against her husband. Something happened in Arizona. If we could use his wife we could tell you, but we cannot. This little fellow who sits in the witness stand [accused's 10-year old son] is going to send him down to hell. I want to agree with Mr. Grace. Something ought to be done with this defendant. The only thing they have attempted to do is to keep him out of the elecrtic chair. They say he needs treatment. You find him guilty by reason of insanity, say he is dangerous at large, he would be sent to Dr. Adams at Vinita. Dr. Adams would look at him, say 'Get out. You are sane.' That's what will happen. These same men that are helping him today would be there with habeas corpus. The State of Oklahoma has a method to take him at McAlester and burn him good and black, take him out of circulation. Obliterate him. He has never been any good to humanity."

There is not much doubt but that the assistant county attorney in his zeal to convict exceeded the bounds of proper commentary, and this court cannot approve the language here complained of. Nevertheless, the error is not sufficient to work a reversal of the case or to justify a reduction in the punishment assessed, because the evidence of defendant's guilt is overwhelming, and the evidence, both lay and expert, is practically undisputed that defendant at the time of the commission of the crime was not so intoxicated as not to be able to form an intent to commit the crime. See Bingham v. State, 82 Okla. Cr. 5, 165 P. 2d 646, where the defendant cut his wife's throat, and where the factual situation in many respects bears a marked resemblance to that of the within case.

It was within the province of the jury to have assessed a lesser punishment than that of death. The instructions of the court in that regard are clear. The jury heard and observed the defendant as they did the other witnesses. The crime was a heinous one. In view of the evidence of defendant's demeanor immediately prior to the killing, and his subsequent confession, the defense attempted may have been considered insincere and so repugnant to the facts developed as to eliminate all vestige of sympathy. We do not know. It was the duty of the jury to determine the issues. It must be conceded that the defendant undoubtedly was a frustrated person beset by conflicting desires and under some emotional strain, although accelerated by alcohol, and who had gone through enough to break a sensitive man, if his story was true. Evidently the jury did not believe him. For if they had, considering that this defendant did not previously have a reputation for violence and crime, they would probably have shown him mercy.

Now, speaking strictly as an individual, while the writer does not find that the defendant has any legal entitlement to any relief from the judgment entered, yet from an overall study of the case and the tragedy presented, it makes most difficult the conclusion the law and the evidence forces. As the late Judge Doyle of this court said in a number of his opinions, "No more serious duty can be imposed upon the courts than the duty of protecting, and the duty of taking, human life." The duty, I must add, is a most solemn one. And I know it is not for the court to theorize on the efficacy of the punishment from a sociological standpoint. The judicial power is to mete out justice under the law prevailing, as applied to the facts shown by the record. Only the executive

power may ponder such questions and extend or withhold mercy as conscience may dictate.

The original time for execution having passed, owing to the pendency of this appeal, it is considered, ordered and adjudged, that the judgment and sentence of the district court of Tulsa county be carried out by the electrocution of the defendant on Friday, the 20th day of July, A. D. 1951.

BRETT, P. J., and JONES, J., concur.