718 S.E.2d 516

**STATE of West Virginia, Respondent**

v.

**Ben Chase SKIDMORE, Petitioner.**

**No. 101581.**

Supreme Court of Appeals of West Virginia.

Submitted Oct. 18, 2011.

Decided Nov. 10, 2011.

Raymond H. Yackel, Esquire, Morgantown, WV, for Petitioner.

Darrell V. McGraw, Jr., Attorney General, Benjamin F. Yancey, III, Assistant Attorney General, Charleston, WV, for Respondent.

PER CURIAM:

The present appeal follows a bifurcated trial in which the defendant, Ben Chase Skidmore (hereinafter "defendant"), was found guilty of first degree murder without a recommendation of mercy. The undisputed evidence presented during the trial established that the defendant killed Steve Yarborough by repeatedly striking him with a hammer.

The defendant raises two errors in this appeal: (1) the circuit court erred by permitting the State to introduce evidence of a prior voluntary manslaughter conviction during the penalty phase of the trial without conducting a balancing test pursuant to Rule 403 of the *West Virginia Rules of Evidence* or assessing the prior conviction pursuant to the factors set forth in *State v. McGinnis*, 193 W.Va. 147, 455 S.E.2d 516 (1994); and (2) the circuit court erred when it instructed the jury on voluntary intoxication. The circuit court's instruction stated, "the evidence that a defendant acted while in a state of gross intoxication is to be considered in determining whether or not the defendant acted with premeditation and deliberation." The defendant argues that the circuit court erred by including the word "gross" before intoxication and failed to fully explain to the jury what constitutes "gross intoxication."

After thorough consideration of the briefs, the record designated for appeal, and the oral arguments of the parties, we affirm the judgment of conviction and sentencing order.

## I. Facts & Background

On Sunday, April 26, 2009, the defendant killed Steve Yarborough by striking the top of his head two to four times with a hammer. This crime occurred in the living room of a house Yarborough and two other men, Jeff Mullenax and Charles Stafford, were renting. The three men allowed the defendant to stay at their house for a few days while he attempted to find employment. All four men were construction workers who had previously lived together.[1]

The trial testimony revealed that the defendant and Yarborough had been arguing the weekend of the murder because the defendant was unemployed, failed to call a foreman about a job, and failed to help with the household chores. A few days before the murder, the defendant told Jeff Mullenax that "he was going to f . . . him (Yarborough) up." On the day of the murder, the defendant threw a cigarette butt on the floor while Yarborough was cleaning the house which led to an argument between the two men. During this argument, Yarborough told the defendant to find a job or move out of the house. Shortly after this argument, Jeff Mullenax and Yarborough left the house and went to a bar to shoot pool and watch a Nascar race. The two returned to the house in the middle of the afternoon, where they continued watching the Nascar race and drinking beer, along with their other roommate, Charles Stafford. While these three men were inside watching television, the defendant spent most of the afternoon sitting on the front porch, talking on his cell phone and drinking beer. The defendant went in and out of the house a few times during the afternoon. During these trips inside, the defendant would use the restroom, get a beer from the refrigerator and have brief conversations with the three men in the living room.

Around 4:30 or 5:00 p.m. that day, the defendant asked Jeff Mullenax to speak with him on the front porch. The defendant was worried about having a place to stay and Mullenax told him he would try to "smooth things over" with Yarborough. After this conversation, Mullenax returned inside with his other roommates while the defendant remained on the porch. Charles Stafford testified that the defendant was walking around on the porch "and he said something about I'll have three hots and a cot."[2] A short

1. The four men previously lived in a trailer along with Charles Stafford's sister and her husband. Yarborough, Mullenax and Stafford decided to rent a house together because there was not enough room in the trailer for six people to live comfortably.

2. According to trial testimony, the expression "three hots and a cot" refers to a person who is

time after he made this statement, the defendant came inside the house, walked through the living room and went into the kitchen where he got a beer out of the refrigerator. Yarborough, Stafford and Mullenax were in the living room watching television when the defendant emerged from the kitchen with a hammer in his hand. Without saying anything, the defendant struck Yarborough on top of his head two to four times. The defendant then turned to Stafford and Mullenax and made the following statements, "don't bother him, he's dead"; "I love you guys to death, but I'll kill you too"; and "I hope the motherf …'s dead, don't check on him."

Charles Stafford left the house and went to his sister's residence shortly after the murder occurred. The defendant told Jeff Mullenax, "don't call the cops on me yet, give me a few hours," and said he was going to head down the road. Before leaving, the defendant apologized to Mullenax, saying "I'm sorry Jeff, but I told you I was going to mess him up."

After the defendant left the residence, Mullenax called 911 and reported the incident. The police located the defendant[3] at a gas station about one mile from the residence. Officers Justin Judy, Jeff Wells and Sean Williams of the Morgantown Police Department arrested the defendant without incident at 12:06 a.m. All three officers stated that the defendant was calm, spoke in a regular voice, understood their questions and was verbally clear. All three officers testified that the defendant used the phrase "three hots and a cot," a detail which Officer Jeff Wells recorded in his report. Officer Sean Williams read the defendant his Miranda rights and the defendant said that he understood them. Officer Williams then put the defendant in his cruiser and drove him to the police station. During the ride, Officer Williams testified that the defendant stated that he was going to have three hots and a cot, and asked Officer Williams if West Virginia had the death penalty. After Officer Williams told him West Virginia did not have

the death penalty, he said the defendant replied, "well that's good, I'll just spend the rest of my life in jail."

The defendant was subsequently charged with first degree murder. Prior to trial, the State moved for bifurcation so that it could introduce evidence of the defendant's 1987 voluntary manslaughter conviction during the penalty phase of the trial. This prior conviction stemmed from the defendant killing a stranger during a fight at a laundromat in California. The California victim's death was caused by blunt force trauma to the head. The circuit court granted the motion to bifurcate.

Following a three-day trial, the jury found the defendant guilty of first degree murder. After returning this verdict, the case proceeded to the penalty phase and the State presented evidence of the defendant's 1987 voluntary manslaughter conviction and offered testimony from the victim's widow. The defendant did not call any witnesses during the penalty phase. The jury returned a finding of "no recommendation for mercy," at the end of the penalty phase and sentenced the defendant to life without mercy. Thereafter, the defendant filed a motion for a new trial raising the same two errors he raises in the present appeal. After the circuit court denied his motion for a new trial, the defendant filed the present appeal.

## II. Standard of Review

■ On appeal to this Court, the defendant contests two rulings made by the circuit court. Our general standard of review for findings and rulings made by a circuit court is as follows:

> In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous

---

incarcerated receiving three meals a day and a place to sleep.

3. The defendant made multiple calls on his cell phone after leaving the residence and the police were able to locate him by "pinging his cell phone."

standard. Questions of law are subject to de novo review.

Syllabus Point 3, *State v. Vance,* 207 W.Va. 640, 535 S.E.2d 484 (2000).

### III. Discussion

The defendant argues that the circuit court erred when it instructed the jury on voluntary intoxication and when it admitted evidence of a prior voluntary manslaughter conviction during the penalty phase of the trial. We consider each of these errors below.

### A. "Gross Intoxication" Instruction

The defendant argues that the circuit court's voluntary intoxication instruction to the jury was not a correct statement of law because it included the words "gross" and "grossly" before the word intoxication. The defendant argues that the term "gross intoxication" came from "an arcane statement of the law in 1907, which has long since been reviewed and expanded upon[.]"

■ Whether jury instructions were properly given is a question of law. *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995). Our standard of review for a challenge to a circuit court's jury instruction is set forth in Syllabus Point 15 of *State v. Bradshaw,* 193 W.Va. 519, 457 S.E.2d 456 (1995):

Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not misled by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. The trial court, therefore, has broad discretion in formulating its charge to the jury, so long as it accurately reflects the law. Deference is given to the circuit court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed for an abuse of discretion.

■ We have previously explained that "[t]he purpose of instructing the jury is to focus its attention on the essential issues of the case and inform it of the permissible ways in which these issues may be resolved. If instructions are properly delivered, they succinctly and clearly will inform the jury of the vital role it plays and the decisions it must make." *State v. Guthrie,* 194 W.Va. at 672, 461 S.E.2d at 178.[4]

■ In the case *sub judice,* the circuit court gave the jury the following instruction on voluntary intoxication:

The Court instructs the jury that although voluntary intoxication or drunkenness will never provide a legal excuse for the commission of a crime, the fact that a person may have been grossly intoxicated at the time of the commission of a crime, may negate the existence of premeditation and deliberation, which is an element of the offense of murder in the first degree. So, the evidence that a defendant acted while in a state of gross intoxication is to be considered in determining whether or not the defendant acted with premeditation and deliberation.

If the evidence in this case leaves you with a reasonable doubt that the accused was capable of forming premeditation and deliberation to commit the crime of murder in the first degree because of gross intoxication, then you should acquit the defendant of the offense of murder in the first degree and deliberate on the lesser included offense of murder in the second degree.

■ The defendant argues that by placing the word "gross" before intoxication, the circuit court impermissibly heightened the level of intoxication a defendant must show in order to negate the premeditation and deliberation elements of first degree murder.[5]

---

4. In footnote 20 of *State v. Miller,* 194 W.Va. 3, 16, 459 S.E.2d 114, 127 (1995), we stated, "without [adequate] instructions as to the law, the jury becomes mired in a factual morass, unable to draw the appropriate legal conclusions based on the facts." We have also recognized that "the jury is the trier of the facts and 'there is no presumption that they are familiar with the

law.'" *State v. Lindsey,* 160 W.Va. 284, 291, 233 S.E.2d 734, 739 (1977), *quoting State v. Loveless,* 139 W.Va. 454, 469, 80 S.E.2d 442, 450 (1954).

5. First and second degree murder are defined in *W.Va.Code* § 61-2-1 (1991):

Murder by poison, lying in wait, imprisonment, starving, or by any willful, deliberate and pre-

This Court has recognized that voluntary intoxication does not ordinarily excuse a crime. *State v. Robinson*, 20 W.Va. 713 (1882). Voluntary intoxication may, however, reduce the degree of the crime or negate a specific intent.[6] A review of our prior cases involving voluntary intoxication reveals that the trial court did not err by placing the word "gross" before intoxication in its voluntary intoxication jury instruction. In Syllabus Point 1 of *State v. Davis*, 52 W.Va. 224, 43 S.E. 99 (1902), this Court stated:

A person guilty of homicide may reduce his crime from murder in the first degree to murder in the second by showing that he was *so intoxicated* at the time the offense was committed as to render him incapable of doing a willful, deliberate, and premeditated act, and that he did not voluntarily become intoxicated for the purpose of committing the offense. All this may be shown by his own and the state's evidence, and the facts and circumstances surrounding the case.

(Emphasis added).

Five years after *Davis* was decided, this Court again addressed the level of intoxication a defendant must show to reduce a charge of first degree murder to second degree murder, stating: "if a sane man, not having voluntarily made himself drunk for the purpose of committing crime, does, while in a state of such *gross intoxication* as to render him incapable of deliberation, commit a homicide, he is guilty of no higher offense than murder in the second degree." (Emphasis added). *State v. Kidwell*, 62 W.Va. 466, 471, 59 S.E. 494, 496 (1907).

The defendant argues that *Kidwell* was the last time this Court used the phrase "gross intoxication" to describe the level of intoxication a defendant must show in order to negate the premeditation and deliberation elements of first degree murder.[7] Since *Kidwell* "the word 'intoxication' has been substituted" for the phrase "gross intoxication" according to the defendant. A review of our post-*Kidwell* cases does not support the defendant's position. For example, in *State v. Painter*, 135 W.Va. 106, 113, 63 S.E.2d 86, 92 (1951), this Court described the level of intoxication a defendant must show to negate deliberation and premeditation, stating: "[i]n trials for homicide, evidence of *gross intoxication*, so as to destroy the pow-

---

meditated killing, or in the commission of, or attempt to commit, arson, kidnaping, sexual assault, robbery, burglary, breaking and entering, escape from lawful custody, or a felony offense of manufacturing or delivering a controlled substance as defined in article four, chapter sixty-a of this code, is murder of the first degree. All other murder is murder of the second degree.

In an indictment for murder and manslaughter, it shall not be necessary to set forth the manner in which, or the means by which, the death of the deceased was caused, but it shall be sufficient in every such indictment to charge that the defendant did feloniously, willfully, maliciously, deliberately and unlawfully slay, kill and murder the deceased.

6. Voluntary intoxication can be used as a partial defense in other specific intent crimes, including burglary and forgery. *See State v. Phillips*, 80 W.Va. 748, 93 S.E. 828 (1917) (Intoxication can serve as a defense to burglary if the defendant was so intoxicated that he could not form the specific intent to commit a felony after breaking and entering); *State v. Fugate*, 103 W.Va. 653, 138 S.E. 318 (1927) (In a forgery case, "the accused may show that he was incapable from intoxication of forming the intent necessary to constitute the crime of forgery.").

7. Justice Cleckley addressed and described premeditation and deliberation in Syllabus Points 5 and 6, in part, of *State v. Guthrie, supra*:

Although premeditation and deliberation are not measured by any particular period of time, there must be some period between the formation of the intent to kill and the actual killing, which indicates the killing is by prior calculation and design. This means there must be an opportunity for some reflection on the intention to kill after it is formed.

In criminal cases where the State seeks a conviction of first degree murder based on premeditation and deliberation, a trial court should instruct the jury that murder in the first degree consists of an intentional, deliberate, and premeditated killing which means that the killing is done after a period of time for prior consideration. The duration of that period cannot be arbitrarily fixed. The time in which to form a deliberate and premeditated design varies as the minds and temperaments of people differ and according to the circumstances in which they may be placed. Any interval of time between the forming of the intent to kill and the execution of that intent, which is of sufficient duration for the accused to be fully conscious of what he intended, is sufficient to support a conviction for first degree murder.

er of deliberation and capacity to meditate, may be shown so as to reduce the homicide from murder of the first degree to murder of the second degree." (Emphasis added).

■ Additionally, in *State v. Keeton*, 166 W.Va. 77, 272 S.E.2d 817 (1980), this Court reiterated that voluntary intoxication can, in certain circumstances, reduce first degree murder to second degree murder. In crafting a new syllabus point, the Court relied specifically on the *Kidwell* decision, citing the phrase "gross intoxication" used in *Kidwell*. *Keeton*, 166 W.Va. at 83, 272 S.E.2d at 820. Syllabus Point 2 of *Keeton* states:

> Voluntary drunkenness is generally never an excuse for a crime, but where a defendant is charged with murder, and it appears that the defendant was *too drunk* to be capable of deliberating and premeditating, in that instance intoxication may reduce murder in the first degree to murder in the second degree, as long as the specific intent did not antedate the intoxication.

(Emphasis added). *Keeton* also noted that "the level of intoxication must be 'such as to render the accused incapable of forming an intent to kill, or of acting with malice, premeditation or deliberation.'" 166 W.Va. at 83, 272 S.E.2d at 821, *quoting* Syllabus Point 1, *State v. Davis*, 52 W.Va. 224, 43 S.E. 99 (1902).

■ Our Court has consistently stated that a defendant must show that he was "so drunk," "too drunk," or "grossly intoxicated," to negate the deliberation and premeditation elements of first degree murder. A reading of our relevant case law indicates that for a defendant to rely on this defense, he must show that his level of intoxication was gross or extreme.

The State presented considerable evidence in the case *sub judice* showing that the defendant's actions were deliberate and premeditated. Jeff Mullenax testified that the defendant made threatening remarks about the victim a few days before the murder, stating that he was going "to f ... him up." There was testimony about an ongoing dis-

pute between the defendant and Yarborough regarding the defendant's failure to pay rent and his failure to do any household chores. The defendant and Yarborough were in an argument a few hours before the murder, concluding with Yarborough telling the defendant to find a job or move out of the house. After the argument and prior to the murder, Charles Stafford heard the defendant make the following statement while talking on his cell phone, "I'll have three hots and a cot."

The defendant presented evidence that he had been drinking on the day of the murder and argued that his level of intoxication impaired his ability to premeditate or deliberate prior to his attack on the victim. The State presented substantial evidence rebutting this argument,[8] including the testimony of Jeff Mullenax who testified that after the murder, the defendant was calm and spoke clearly. The defendant was coherent enough following the murder to tell Mullenax "don't call the cops on me yet, give me a few hours." The three arresting officers testified that the defendant's speech was clear and coherent. The defendant was coherent enough to ask Officer Williams whether West Virginia had the death penalty. Both the State and counsel for the defendant addressed the defendant's level of intoxication during their closing arguments and the resolution of this issue was a question of fact for the jury to decide.

Based on all of the foregoing, we find that when viewed as a whole and in the context of the trial, the voluntary intoxication instruction was not misleading and contained an adequate statement of law to guide the jury's deliberation. We therefore conclude that the circuit court did not abuse its discretion by using the phrase "gross intoxication" in its voluntary intoxication jury instruction.

### B. Prior Conviction Introduced During the Penalty Phase of the Trial

■ The second error·raised by the defendant is that the circuit court erred by permitting the State to introduce evidence of a prior voluntary manslaughter conviction

---

8. It is undisputed that the defendant was drinking on the day of the murder. The defendant's

level of intoxication and how it impaired him that day were the disputed factual issues.

during the penalty phase of the trial without conducting a balancing test pursuant to Rule 403 of the *West Virginia Rules of Evidence* or assessing the prior conviction pursuant to the factors set forth in *State v. McGinnis,* 193 W.Va. 147, 455 S.E.2d 516 (1994).

The penalty phase of the trial began on March 19, 2010. At the beginning of this hearing, counsel for the defendant objected to the circuit court's failure to hold a hearing pursuant to *McGinnis,* to determine whether the defendant's 1987 voluntary manslaughter conviction should be admitted into evidence.[9] Two weeks before the penalty phase of the trial began, this Court decided *State ex rel. Dunlap v. McBride,* 225 W.Va. 192, 691 S.E.2d 183 (2010). In *Dunlap,* the defendant was convicted of the first degree murder of his wife. He argued that during the penalty phase of his trial, the State improperly introduced other bad act evidence without the trial court first conducting a *McGinnis* hearing to determine whether that evidence should have been admitted. The Court found no error, stating:

Mr. Dunlap has failed to cite any decision of this Court where we have required a *McGinnis* hearing for sentencing purposes only. As a general matter, "[t]he rules of evidence, including Evid. R. 404(b) regarding 'other acts,' do not strictly apply at sentencing hearings." *State v. Combs,* No. CA2000–03–047, 2005 WL 941133, at *2 (Ohio Ct.App.2005). *See Patton v. State,* 25 S.W.3d 387, 392 (Tex.App.2000) ("It has been held that Rule 404(b) does not apply to the penalty or punishment phase of a bifurcated trial."). Moreover, "[a] trial court has wide discretion in the sources and types of evidence used in determining the kind and extent of punishment to be imposed. And a sentencing

court is not restricted by the federal constitution to the information received in open court." *Elswick v. Holland,* 623 F.Supp. 498, 504 (S.D.W.Va.1985) (citations omitted). Therefore, we find this issue to be without merit.

*Dunlap,* 225 W.Va. at 202, 691 S.E.2d at 193.

The circuit court, relying on *Dunlap,* overruled the defendant's objection and allowed testimony concerning the defendant's prior conviction. The subsequent testimony revealed that on February 20, 1987, the defendant was at a laundromat in Los Angeles, California, doing his laundry and drinking a beer. A man, Wesley Oren Wahl, approached the defendant and asked him for a drink of his beer. The defendant refused and a fight ensued, resulting in Wahl's death. The victim had injuries to the back of his head, the top of his head, his upper torso, and a laceration to the right side of his neck. The cause of death was blunt force trauma to the head. The defendant was convicted of voluntary manslaughter and served twelve years in prison.

Based on the plain language of *Dunlap,* we find no error with the circuit court's decision not to hold a *McGinnis* hearing prior to the introduction of the defendant's 1987 voluntary manslaughter conviction. The defendant has failed to cite any decision of this Court where we have required a *McGinnis* hearing for sentencing purposes only.

The defendant next argues that the circuit court erred by failing to assess his prior conviction pursuant to Rule 403 of the *West Virginia Rules of Evidence.* Rule 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair preju-

---

9. In *McGinnis,* the Court set forth the standard for determining the admissibility of evidence of other bad acts by a defendant:

Before admitting the evidence, the trial court should conduct an *in camera* hearing as stated in *State v. Dolin,* 176 W.Va. 688, 347 S.E.2d 208 (1986). After hearing the evidence and arguments of counsel, the trial court must be satisfied by a preponderance of the evidence that the acts or conduct occurred and that the defendant committed the acts. If the trial court does not find by a preponderance of the evidence that the acts or conduct was commit-

ted or that the defendant was the actor, the evidence should be excluded under Rule 404(b). If a sufficient showing has been made, the trial court must then determine the relevancy of the evidence under Rules 401 and 402 of the West Virginia Rules of Evidence and conduct the balancing required under Rule 403 of the West Virginia Rules of Evidence. If the trial court is then satisfied that the Rule 404(b) evidence is admissible, it should instruct the jury on the limited purpose for which such evidence has been admitted.
Syllabus Point 2, in part, *McGinnis.*

dice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The circuit court's decision to admit this evidence was guided by *Dunlap*, which stated that "the rules of evidence . . . do not strictly apply at sentencing hearings." *Id*. Three months after the defendant was sentenced to life without mercy, this Court again addressed the type of evidence that is admissible during the penalty phase of a bifurcated trial and expanded on the discussion contained in *Dunlap*. In Syllabus Point 7 of *State v. McLaughlin*, 226 W.Va. 229, 700 S.E.2d 289 (2010), the Court held:

> The type of evidence that is admissible in the mercy phase of a bifurcated first degree murder proceeding is much broader than the evidence admissible for purposes of determining a defendant's guilt or innocence. Admissible evidence necessarily encompasses evidence of the defendant's character, including evidence concerning the defendant's past, present, and future, as well as evidence surrounding the nature of the crime committed by the defendant that warranted a jury finding the defendant guilty of first degree murder, so long as that evidence is found by the trial court to be relevant under Rule 401 of the West Virginia Rules of Evidence and not unduly prejudicial pursuant to Rule 403 of the West Virginia Rules of Evidence.

*McLaughlin* did not overrule *Dunlap*, rather it expanded on it and set forth the precise analysis a circuit court should undertake when deciding whether evidence is admissible during the penalty phase of a bifurcated trial. This includes a relevancy analysis pursuant to Rule 401 of the *West Virginia Rules of Evidence* and deciding whether the evidence is unduly prejudicial pursuant to Rule 403. *McLaughlin* expressly states that "[t]his holding is to be applied prospectively." *McLaughlin*, 226 W.Va. at 235, 700 S.E.2d at 295. *McLaughlin* was not in effect at the time the circuit court admitted the defendant's prior conviction in the case *sub judice*. The circuit court was guided by *Dunlap*, which did not

require an analysis pursuant to Rules 401 and 403.

 Had the circuit court conducted an analysis pursuant to Rules 401 and 403, the defendant's prior conviction would have been admissible. The United States Supreme Court has stated that during the penalty stage of a trial, a jury considers the character and propensities of a defendant in order to make a "unique, individualized judgment regarding the punishment that a particular person deserves." *Zant v. Stephens*, 462 U.S. 862, 900, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (Rehnquist, J., concurring). In *State v. Finley*, 219 W.Va. 747, 752, 639 S.E.2d 839, 844 (2006), this Court explained that:

> At the penalty phase, the jury is no longer looking narrowly at the circumstances surrounding the charged offense. In order to make a recommendation regarding mercy, the jury is bound to look at the broader picture of the defendant's character—examining the defendant's past, present and future according to the evidence before it—in order to reach its decision regarding whether the defendant is a person who is worthy of the chance to regain freedom.

In a dissenting opinion to *Schofield v. West Virginia Department of Corrections*, 185 W.Va. 199, 207, 406 S.E.2d 425, 433 (1991) (Workman, J., dissenting), a similar rationale was set forth: "[i]f a particular defendant has an egregious criminal history or a marked propensity for violence, for example, that would also be an appropriate factor for the jury to consider (during the mercy phase of a bifurcated trial)." In the present case, the defendant's prior conviction was highly relevant to whether he should receive mercy. His prior conviction shows that he has a propensity for violence and that after receiving a twelve-year sentence for killing a man in 1987, this defendant did not reform himself and demonstrate that he was worthy of mercy. Rather, he killed another man, Steve Yarborough, through blunt force trauma to the head. The defendant's 1987 voluntary manslaughter conviction is clearly relevant and shows the broader picture of the defendant's character. The defendant has failed

to articulate any plausible basis demonstrating why evidence of his prior conviction should not have been admitted under Rules 401 and 403.

Based on all the reasons set forth above, we find that the circuit court did not commit error by failing to conduct an analysis pursuant to Rules 401 and 403 of the *West Virginia Rules of Evidence* prior to admitting the defendant's 1987 voluntary manslaughter conviction.[10]

### IV. Conclusion

The circuit court's March 19, 2010, order convicting and sentencing the defendant is affirmed.

Affirmed.

---

**10.** We reiterate our current law on this issue is set forth in Syllabus Point 7 of *McLaughlin,* and circuit courts determining whether evidence is admissible during the penalty phase of a bifurcated first degree murder proceeding should conduct their analysis pursuant to *McLaughlin.*