**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

**STATE OF WEST VIRGINIA,**
**Plaintiff Below, Respondent**

vs) **No. 15-0933** (Raleigh County 11-F-286)

**BRIAN DANIEL HAYSLETT,**
**Defendant Below, Petitioner**

**FILED**

**November 7, 2017**

**released at 3:00 p.m.**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**MEMORANDUM DECISION**

The petitioner, Brian Daniel Hayslett, appeals the August 26, 2015, order of the Circuit Court of Raleigh County sentencing him to life in prison without mercy for his first degree murder conviction. In this appeal, the petitioner contends that the circuit court committed reversible error by refusing to give the jury his proffered instruction concerning voluntary intoxication. The State maintains the evidence did not warrant such an instruction.[1]

Upon consideration of the parties' briefs, oral arguments, the appendix record, and the pertinent authorities, this Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

## I. Factual and Procedural Background

Rhonda McCoy (hereinafter "victim") was murdered sometime between midnight and 3:00 a.m. on June 19, 2011. The cause of death was twenty-three distinct stab wounds inflicted to her head, neck, torso, and upper extremities. According to the medical examiner, the victim was nearly beheaded, but her death was not instantaneous; it took "a matter of minutes." The murder occurred at a trailer owned by Jeffrey Redden, who discovered the

---

[1]The petitioner was represented by attorney Jason D. Parmer of the Public Defenders Services in Charleston, West Virginia. Raleigh County Prosecuting Attorney Kristen Keller appeared on behalf of the State.

1

victim's body in a bedroom used for storage.[2]  He notified the police at 8:08 that morning, telling the 911 operator that the victim had been in a fight "with a guy named Brian who lives down the street."  The Raleigh County Sheriff's Office responded to the call.  Upon arrival at the Redden trailer, Captain James Bare discovered a trail of blood leading to a nearby residence owned by Lisa Meador, which she shared with the petitioner.[3]  Ms. Meador told Captain Bare that the petitioner had come home in the middle of the night covered in blood.  She said he had a cut on his hand and was carrying a knife.  She further stated that he left shortly thereafter with his mother to go to her home.   While Captain Bare was conducting his investigation, the petitioner arrived in a car driven by his mother, Donna Daniels.

Captain Bare approached the petitioner and read him his *Miranda* rights.[4]  According to Captain Bare, the petitioner did not appear to be impaired and showed no sign of distress, surprise or confusion.  Captain Bare proceeded to record an on-scene interview with the petitioner.  Initially, the petitioner denied having any knowledge regarding the blood trail from Mr. Redden's trailer to Ms. Meador's residence.  When questioned about his fingers that appeared to be bleeding, the petitioner claimed he had been injured at work a few days earlier.  Upon further inquiry, however, the petitioner confessed that he had stabbed the victim.  The petitioner's confession to Captain Bare was recorded at that time as follows:

| | |
|---|---|
| HAYSLETT: | She [the victim] just was up there dancing for me and Jeff [Redden] and nobody told her to, and then we come outside and she was like well you owe me money. |
| BARE: | Okay. |
| HAYSLETT: | I said, no, no. |
| BARE: | You owed her money for dancing? |
| HAYSLETT: | Yeah. |

* * *

---

[2]According to Mr. Redden, he was in the other bedroom, "passed out" from drinking, when the murder occurred.  When he went to sleep that night, the victim was in bed with him.  When he awoke the next morning, she was not there.  He became concerned when he noticed that her purse was "dumped out in the living room floor."  He then began looking for the victim and discovered her in the other bedroom under a pile of clothing.

[3]The record indicates that Ms. Meador and the petitioner had been in a relationship and had lived together for several years but were not married.  Nonetheless, Ms. Meador was sometimes referred to as the petitioner's fiancée or wife during the proceedings below.

[4]*See Miranda v. Arizona*, 384 U.S. 436 (1966).

| | |
|---|---|
| HAYSLETT: | And she said well I'm going to tell your old lady [Ms. Meador] then. |
| BARE: | Okay. |
| HAYSLETT: | And that was that. |
| BARE: | So what did you do then? |
| HAYSLETT: | Just went back to my house and come back and that was that. |
| BARE: | Were you mad when you went back to your house? |
| HAYSLETT: | Uh-huh (yes). |

* * *

| | |
|---|---|
| BARE: | Okay. So you . . . drove home and then you walked back up here, is that right? |
| HAYSLETT: | Yeah. |
| BARE: | Okay. You walked back up here with . . . a hunting knife. Is that right? You have to say "yes" or "no." |
| HAYSLETT: | Yes. |

* * *

| | |
|---|---|
| HAYSLETT: | Of course, I, so you know what I mean, just talked to her and she was still saying that shit, so I didn't want her telling my old lady nothing. |

* * *

| | |
|---|---|
| BARE: | I see what happened, but I want you to tell me what happened. I mean I can see it, but I want you to tell me. |
| HAYSLETT: | I just stabbed her in the throat. |
| BARE: | Stabbed her in the throat. How many times did you stab her? |
| HAYSLETT: | I don't know. |
| BARE: | A bunch? |
| HAYSLETT: | I don't know, I guess. |
| BARE: | Did you cut your hand . . . during the altercation? |
| HAYSLETT: | Yeah. |
| BARE: | Was she fighting you? |
| HAYSLETT: | No. |
| BARE: | No. She was just saying she was still going to tell your wife and you pulled out the knife and cut her throat? |
| HAYSLETT: | Yeah. |

* * *

| | |
|---|---|
| BARE: | I mean did you try to hide her body or anything? |
| HAYSLETT: | No. Threw clothes over her I guess. |

BARE:                    Alright. Where you stabbed her, is that where . . . where
                         she's laying right now is that where you stabbed her?
HAYSLETT:                Yeah.

Subsequently, the petitioner was indicted for first degree murder. At trial, the State asserted that the petitioner committed first degree murder by deliberation and premeditation or, alternatively, through the commission of a felony, namely burglary.[5] The petitioner did not deny that he had killed the victim. Instead, he testified that he had no memory of what happened between the hours of 2:00 p.m. on June 18, 2011, and 9:00 a.m. on June 19, 2011, due to intoxication as result of his consumption of several Xanax pills and alcohol. The defense's theory was that the petitioner could only be convicted of second degree murder because his intoxication precluded him from forming the requisite intent to commit first degree murder.

The evidence presented at trial showed that sometime during the morning of June 18, 2011, the petitioner went to the Redden trailer where he stayed for approximately three hours. Both Mr. Redden and the victim were there and, according to the petitioner, the three of them consumed two one-liter bottles of Lord Calvert whiskey and "snorted" a few more pills. The petitioner testified that he took five or six Xanax pills before going to the Redden trailer. By mid-afternoon, other people arrived, and they gathered around a fire pit outside the trailer. At some point, the petitioner and the victim got into a verbal argument. According to the petitioner, the victim performed an unsolicited lap dance for him and Mr. Redden and then demanded twenty dollars from each of them. The petitioner said that when he refused to pay

---

[5]West Virginia Code § 61-2-1 (2014) provides, in relevant part:

> Murder by poison, lying in wait, imprisonment, starving, or by any willful, deliberate and premeditated killing, or in the commission of, or attempt to commit, arson, kidnapping, sexual assault, robbery, burglary, breaking and entering, escape from lawful custody, or a felony offense of manufacturing or delivering a controlled substance as defined in article four [§§ 60A-4-401 et seq.], chapter sixty-a of this code, is murder of the first degree. All other murder is murder of the second degree.

Pursuant to West Virginia Code § 61-3-11(a) (2014), "[i]f any person shall, in the nighttime, break and enter, or enter without breaking, or shall, in the daytime, break and enter, the dwelling house, or an outhouse adjoining thereto or occupied therewith, of another, with intent to commit a crime therein, he shall be deemed guilty of burglary."

4

the victim, she threatened to tell Ms. Meador that she "had sex" with him. Mr. Redden testified that he intervened in the argument between the petitioner and the victim and eventually told the petitioner that he needed to go home.

In his June 19, 2011, statement to the police, Mr. Redden said, "I think I heard [the petitioner] threaten her first saying that you ain't going to F'ing tell my wife anything, and then he called her a bunch of names." Mr. Redden also told the police that the petitioner was "pretty drunk." However, at trial, when confronted with his statement, Mr. Redden testified: "After thinking a little more about it, then I can't remember him ever drinking anything there and he didn't seem to be staggering or nothing like that." On cross-examination, Mr. Redden acknowledged that he could not say whether or not the petitioner was drunk but maintained that "he wasn't staggering drunk."

Ms. Meador testified that she and the petitioner got into a fight on June 18, 2011, because she disapproved of the petitioner going to the Redden trailer and, afterward, she left to go "play the poker machines." Ms. Meador said when she returned between 9:00 and 9:30 that evening, the petitioner was intoxicated, but she never observed him drinking whiskey[6] or beer. In fact, she and the petitioner's mother, who arrived around the same time, removed the beer that was in the refrigerator and poured it down the sink drain. Ms. Meador further testified that the petitioner told her that he had "killed a man" in a fist fight and that he was washing his truck to remove the blood. Ms. Meador said she did not believe the petitioner's claim that he had killed a man and that there was mud–not blood–on his truck. According to Ms. Meador, a couple of hours after she got home, the petitioner said he was going to go back to the Redden trailer to get more beer. She noticed that the petitioner had a hunting knife stuck down the back of his pants, and both she and the petitioner's mother tried to stop him from leaving. Ms. Meador testified that the petitioner returned ten to fifteen minutes later covered in blood and told her he had cut his hand. She testified that she locked herself in the bathroom because she was afraid of him, and he left with his mother approximately an hour later. On cross-examination, Ms. Meador denied that the petitioner was "drunk out of his mind" that evening.

The petitioner's mother, Donna Daniels, testified that she went to Ms. Meador's residence after her son called her at 9:20 p.m. on June 18, 2011. She said that when she arrived, the petitioner was washing his truck. According to Ms. Daniels, she told Ms. Meador to pour out the beer left in the refrigerator because her son was already intoxicated. She said that at some point, the petitioner left to go to the Redden trailer to get more beer.

---

[6]Ms. Meador did state that the petitioner had a whiskey bottle sometime that afternoon.

She noticed that the petitioner had a knife stuck down the back of his pants, and she ran after him attempting to stop him, but he pushed her down so she went back inside Ms. Meador's residence. According to Ms. Daniels, she and Ms. Meador were afraid of the petitioner and were preparing to leave when he returned from the Redden trailer covered in blood. Ms. Daniels said her son was "white as a ghost," made "growling noises," and went into the bathroom and threw up. Ms. Daniels testified that her son told her he had stabbed the victim, but they did not tell Ms. Meador. Ms. Daniels said the petitioner changed his clothes, and she put the bloody clothing in a bag in her car and placed the knife under the front seat.[7]

On cross-examination, the State questioned Ms. Daniels about her statement to Captain Bare wherein she said that the petitioner told her "that he went up to the trailer because the [victim] was threatening to tell his fiancée and they were having sex . . . . He went in and asked [the victim] who was there, and she stated just Jeff who was passed out in the bedroom. He asked her about the back room and she walked back to look and no one was there . . . he stabbed her, Ms. McCoy, in the throat, then stuck the knife through her neck, entering on the side and exiting on the other, and then pulled forward ripping her throat open." Ms. Daniels acknowledged that the petitioner told her "Ms. McCoy began gurgling on the blood and so that [sic] he stabbed her in the lung." She also testified that the petitioner warned her not to say anything and that she never attempted to contact the police because she was afraid of him.[8]

At the close of evidence, the petitioner requested that the jury be given a voluntary intoxication instruction. This Court has held that

> [v]oluntary drunkenness is generally never an excuse for a crime, but where a defendant is charged with murder, and it appears that the defendant was too drunk to be capable of deliberating and premeditating, in that instance intoxication may

---

[7]The clothing was never found by the police. The knife, which the petitioner tossed out of his mother's car window and into the woods the next morning, was recovered by the police with the help of Ms. Daniels.

[8]Ms. Daniels was not charged with any crime in connection with the victim's death. Pursuant to West Virginia Code § 61-11-6 (2014), "no person in the relation of husband and wife, parent or grandparent, child or grandchild, brother or sister, by consanguinity or affinity, or servant to the offender, who, after the commission of a felony, shall aid or assist a principal felon, or accessory before the fact, to avoid or escape from prosecution or punishment shall be deemed an accessory after the fact."

reduce murder in the first degree to murder in the second degree, as long as the specific intent did not antedate the intoxication.

Syl. Pt. 2, *State v. Keeton,* 166 W.Va. 77, 272 S.E.2d 817 (1980). Upon consideration, the trial court found that the petitioner failed to present sufficient evidence to warrant a voluntary intoxication instruction.[9] Following deliberations, the jury returned a verdict finding the petitioner guilty of first degree murder without a recommendation of mercy. The sentencing order was entered on August 26, 2015, and this appeal followed.

## II.  Standard of Review

The only error asserted by the petitioner in this appeal is the circuit court's refusal to give a voluntary intoxication instruction.   It is well established that

> [a] trial court's refusal to give a requested instruction is reversible error only if:  (1) the instruction is a correct statement of the law; (2) it is not substantially covered in the charge actually given to the jury;  and (3) it concerns an important point in the trial so that the failure to give it seriously impairs a defendant's ability to effectively present a given defense.

Syl. Pt. 11, *State v Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994). Critically, "[i]nstructions must be based upon the evidence and an instruction which is not supported by evidence should not be given." Syl. Pt. 4, *State v. Collins*, 154 S.E.2d 771, 180 S.E.2d 54 (1971). "Whether facts are sufficient to justify the delivery of a particular instruction is reviewed by this Court under an abuse of discretion standard.  In criminal cases where a conviction results, the evidence and any reasonable inferences are considered in the light most favorable to the prosecution." *Derr*, 192 W.Va. at 168, 451 S.E.2d at 734, syl. pt. 12.

## III.  Discussion

Upon review, we are unable to find that the circuit court abused its discretion by refusing to give the jury a voluntary intoxication instruction.

> Our Court has consistently stated that a defendant must show that he was "so drunk," "too drunk," or "grossly intoxicated," to

---

[9]The jury was instructed on first degree murder by premeditation and deliberation, felony murder, and second-degree murder as a lesser included offense.

negate the deliberation and premeditation elements of first degree murder. A reading of our relevant case law indicates that for a defendant to rely on this defense, he must show that his level of intoxication was gross or extreme.[10]

*State v. Skidmore*, 228 W.Va. 166, 172, 718 S.E.2d 516, 522 (2011) (footnote added). Accordingly,

> [w]e have, of course, upheld the trial court's refusal to instruct the jury on the defense of drunkenness on several occasions. As a general rule, we have held that the level of intoxication must be such as to render the accused incapable of forming an intent to kill, or of acting with malice, premeditation or deliberation.

*Keeton*, 166 W.Va. at 83, 272 S.E.2d at 820-21 (footnote, citation, and quotations omitted).

The only evidence presented by the defendant regarding the level of his intoxication was his own self-serving testimony that he was drinking and ingesting prescription drugs in the afternoon before the murder, and the testimony of Ms. Meador and Ms. Daniels that he was "fairly intoxicated" that evening. However, neither Ms. Meador nor Ms. Daniels testified that they observed the petitioner drinking alcohol. In fact, at least two hours before the murder occurred, they disposed of the beer in the refrigerator in Ms. Meador's home.

---

[10]*See* Syl. Pt. 1, *State v. Davis*, 52 W.Va. 224, 43 S.E. 99 (1902) ("A person guilty of homicide may reduce his crime from murder in the first degree to murder in the second, by showing that he was so intoxicated at the time the offense was committed as to render him incapable of doing a willful, deliberate, and premeditated act, and that he did not voluntarily become intoxicated for the purpose of committing the offense. All this may be shown by his own and the State's evidence, and the facts and circumstances surrounding the case."); *State v. Kidwell*, 62 W.Va. 466, 471, 59 S.E. 494, 496 (1907) ("[I]f a sane man, not having voluntarily made himself drunk for the purpose of committing crime, does, while in a state of such gross intoxication as to render him incapable of deliberation, commit a homicide, he is guilty of no higher offense than murder in the second degree."); *State v. Painter*, 135 W.Va. 106, 113, 63 S.E.2d 86, 92 (1950) ("In trials for homicide, evidence of gross intoxication, so as to destroy the power of deliberation and capacity to meditate, may be shown so as to reduce the homicide from murder of the first degree to murder of the second degree.").

Although the petitioner claimed at trial that he could not remember anything that happened between leaving the Redden trailer in the afternoon of June 18, 2011, and waking up at his mother's house the next morning, the evidence clearly proved otherwise. Ms. Daniels told the police that immediately after the petitioner committed the murder, he returned to Ms. Meador's home and confessed to her, stating that he stabbed the victim in the throat; that he "stuck the knife through her neck, entering on one side and exiting on the other . . . ripping her throat open"; and that he stabbed her in the lung because she began gurgling.[11] Furthermore, the petitioner never claimed he was intoxicated or could not remember what happened when he spoke to Captain Bare the morning after the murder. Indeed, Captain Bare testified that the petitioner expressed no distress, surprise or confusion.[12] Not only did the petitioner confess to the murder to Captain Bare, he once again gave precise details about what happened, acknowledging that he stabbed the victim a "bunch" of times and covered her with clothing before leaving the trailer. The fact that the petitioner was able to recall specific details of the murder during his confessions directly contradicts his claim that he was so drunk he did not remember what happened that night. Moreover, the evidence showed that immediately before the murder, the petitioner obtained the murder weapon– a hunting knife–and then outran Ms. Meador and his mother to get to the Redden trailer located approximately 176 yards away. Minutes later, he proceeded to stab the victim twenty-three times. Such actions are not indicative of "gross" or "extreme" intoxication but rather are considerable evidence of the ability to form the requisite intent for first degree murder. We have held that "[i]t is not error to refuse instructions not justified by the evidence." *Davis*, 52 W.Va. at 224, 43 S.E. at 99, syl. pt. 2. In this case, it is abundantly clear that the evidence did not justify a voluntary intoxication instruction.

Accordingly, for the reasons set forth above, the final order of the Circuit Court of Raleigh County entered on August 26, 2015, is affirmed.

Affirmed.

---

[11]The medical examiner testified that gurgling was the only sound the victim would have been able to make because the petitioner severed her voice box and carotid arteries.

[12]The other police officers who had contact with the petitioner that morning confirmed during their testimonies that his behavior was "normal" and that he did not appear to be distressed or confused. In addition, one of the officers testified that the petitioner inquired about the penalties for "anyone that may have helped him" and later stated, "I did it, let's go, what are we waiting on."

**ISSUED:** November 7, 2017

**CONCURRED IN BY:**

Chief Justice Allen H. Loughry II
Justice Margaret L. Workman
Justice Menis E. Ketchum
Justice Elizabeth D. Walker

**DISSENTING AND WRITING SEPARATELY:**

Justice Robin Jean Davis

Davis, J., dissenting:

The Petitioner in this case was convicted of first degree murder and sentenced to life in prison without the possibility of parole. During the trial of the case, the Petitioner did not deny that he killed the victim. The Petitioner's defense was that he was intoxicated at the time of the crime and should be convicted of second degree murder. Based upon the evidence the Petitioner introduced to show that he was intoxicated, he asked the trial court to instruct the jury on his defense of intoxication. The trial court denied the instruction even though it was supported by the evidence. In this appeal, the majority opinion concluded that the trial court did not commit error in denying the Petitioner's request to instruct the jury on the defense of intoxication. For the reasons set out below, I dissent.

We have held that "[p]rovided an accused did not intentionally become intoxicated so as to prepare himself for the commission of the crime, intoxication of an accused is a defense to a charge of murder of the first degree, when the degree of intoxication is such as to render the accused incapable of premeditation and deliberation." Syl. pt. 2, *State v. Bragg*, 140 W. Va. 585, 87 S.E.2d 689 (1955). *See also* Syl. pt. 4, *State v. Burdette*, 135 W. Va. 312, 63 S.E.2d 69 (1950) ("Intoxication to reduce an unlawful homicide from murder in the first degree, must be such as to render the accused incapable of forming an intent to kill, or of acting with malice, premeditation or deliberation."). Further, we have held that,

> [v]oluntary drunkenness is generally never an excuse for a crime, but where a defendant is charged with murder, and it appears that the defendant was too drunk to be capable of deliberating and premeditating, in that instance intoxication may reduce murder in the first degree to murder in the second degree, as long as the specific intent did not antedate the intoxication.

10

Syl. pt. 2, *State v. Keeton*, 166 W. Va. 77, 272 S.E.2d 817 (1980). *See also State v. Rowe*, 168 W. Va. 678, 285 S.E.2d 445 (1981) ("In this State voluntary intoxication . . . will only reduce first-degree murder to second-degree murder."). It also has been recognized "that for a defendant to rely on this defense, he must show that his level of intoxication was gross or extreme." *State v. Skidmore*, 228 W. Va. 166, 172, 718 S.E.2d 516, 522 (2011). With respect to a trial court's duty to instruct a jury on the defense, we have said,

> [w]here there is evidence in a murder case to support the defendant's theory that his intoxication at the time of the crime was such that he was unable to formulate the requisite intent to kill, it is error for the trial court to refuse to give a proper instruction presenting such a theory when requested to do so.

Syl. pt. 4, *Keeton*. *See also* Syl. pt. 3, *State v. Bragg*, 140 W. Va. 585, 87 S.E.2d 689 (1955) ("In a prosecution on a charge of murder of the first degree, it is not error for the trial court to refuse instructions offered by the defendant, which permitted the jury to find that defendant at the time of the alleged murder was in such a state of intoxication that he was incapable of intent or premeditation, where there is no substantial evidence in the record to support such theory of defense.").

The facts introduced at trial in this case clearly established that the trial court committed reversible error in refusing the Petitioner's request to instruct the jury on his defense. At the trial, the Petitioner testified that on the day of the crime he spent several hours at a friend's home taking drugs and drinking alcohol. The Petitioner left the friend's home after he got into an argument with the victim regarding payment to her for performing a lap dance. When the Petitioner went home, he began drinking beer and whiskey. The Petitioner's girlfriend testified that when she came home she found the Petitioner "pretty intoxicated . . . fairly intoxicated." The Petitioner's girlfriend left the home but returned around 9:00 p.m. and found that he was "even more intoxicated." Further, when the Petitioner's girlfriend returned home she found him washing his truck and stating that blood was on the truck. The Petitioner stated he killed a man while his girlfriend was away and burned the body in a barrel behind their house. The Petitioner's girlfriend did not see any blood on the truck and believed that talk about killing a man was nonsense.

Petitioner's mother arrived at his home around 9:30 p.m. His mother testified that he was "very intoxicated," and that he was staggering and saying "things that didn't make sense." Because of the Petitioner's "grossly intoxicated state," his mother and girlfriend removed beer from the refrigerator and poured it out. Petitioner's mother stated that he was

behaving bizarrely, growling in a deep voice, that his face changed in appearance, and that he was acting "like I'd never ever seen him before in my life."

Within an hour after Petitioner's mother arrived, he went to the victim's home and killed her. Petitioner returned to his home within minutes of killing the victim. Petitioner's mother stated that when he returned he continued to make growling sounds and "vomited in the bathroom and the kitchen sink before falling down."

It is clear to me from the above evidence that the trial court was required to give the Petitioner's requested instruction on intoxication. The trial court's ruling denied the Petitioner's due process right to a fair trial. Consequently, I believe the Petitioner was entitled to a new trial.

Before I end my comments, I also must address a ruling the trial court made that prevented Petitioner's girlfriend and mother from providing the jury with their opinion of his mental state at the time of the crime. Although this issue was not raised as an assignment of error on appeal, the majority opinion should have addressed the matter sua sponte under the plain error doctrine. We have made clear that

> [t]his Court's application of the plain error rule in a criminal prosecution is not dependent upon a defendant asking the Court to invoke the rule. We may, sua sponte, in the interest of justice, notice plain error.

Syl. pt. 1, *State v. Myers*, 204 W. Va. 449, 513 S.E.2d 676 (1998). Moreover, we have held that,

> [t]o trigger application of the "plain error" doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings.

Syl. pt. 7, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995). Finally, we recognized in Syllabus point 7 of *State v. McWilliams*, 177 W.Va. 369, 352 S.E.2d 120 (1986), that lay persons could give opinions as to the mental condition of a defendant:

> When lay witnesses testify about a person's mental condition, the following factors are to be considered: (1) the witnesses' acquaintance with the person and opportunity to observe the person's behavior; (2) the time during which the

12

observation occurred; and (3) the nature of the behavior observed.

*See also* Louis J. Palmer, Jr., Robin Jean Davis, and Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers*, § 701.02[3][f], at 14 (6th ed. 2015) ("A lay witness who is acquainted with a party and who has observed his or her behavior, may testify as to his or her observations and give such an opinion as to the general mental condition of the party as may be within the bounds of common experience and means of observation of people.").

In light of the above authorities, it is clear that the trial court committed plain error in prohibiting Petitioner's girlfriend and mother from informing the jury of their opinion of his mental state at the time of the crime. Both witnesses were prepared to inform the jury that, at the time of the crime, the Petitioner was "hallucinating," "crazy," "delusional," and was "out of his head, like a madman." The trial court erroneously found that the witnesses could not give such opinions. *See* W. Va. R. Evid. 701 (opinion testimony by lay witnesses); Palmer, et al., *Handbook on Evidence*, § 701.02[1], at 4 ("Rule 701 permits a lay (non-expert) witness to provide testimony in the form of opinions. This rule limits the opinions to those that are (1) rationally based on the perception of the witness, (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue, and (3) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."). This evidence was relevant and admissible to support the Petitioner's intoxication defense. The exclusion of this evidence added to the denial of the Petitioner's right to a fair trial.

Based upon the foregoing, I dissent.